975 A.2d 1084

Kimberly CONNOR and Larry Connor, in their own right and as the Parents and Guardians of Eric Connor, a Minor, Appellants

v.

ARCHDIOCESE OF PHILADELPHIA, St. Eleanor's School, Reverend Patrick Sweeney, Pastor and Sister Mary Marie Heenan, RSM, Appellees.

Supreme Court of Pennsylvania.

Argued April 14, 2009.

Decided July 20, 2009.

578

Alan Steven Gold, Esq., Gold & Robins, P.C., Elkins Park, for Kimberly Connor and Larry Connor et al., appellants

Nicholas Deenis, Esq., Michael D. O'Mara, Esq., Thomas Walter Dymek, Esq., Stradley, Ronon, Stevens & Young, L.L.P., Philadelphia, for Archdiocese of Philadelphia, et al., appellees.

Philip Joseph Murren, Esq., Ball, Murren & Connell, Harrisburg, for Pennsylvania Catholic Conference, appellee amicus curiae.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD and GREENSPAN, JJ.

## *OPINION*

Chief Justice CASTILLE.

The single issue presented in the instant case is whether the civil courts of this Commonwealth have subject-matter jurisdiction over a tort suit alleging defamation and negligent infliction of emotional distress arising out of a parochial school's expulsion of a student for allegedly bringing a weapon to school, and the school's communication of the expulsion to the school community. Citing the long-standing common-law precept known as the deference rule, according to which civil courts decline to exercise jurisdiction over cases that would require them to decide ecclesiastical questions, the lower courts held that they lacked jurisdiction over the instant case. For the reasons that follow, we hold that the lower courts erred in finding that the deference rule applies here, and we therefore reverse and remand the matter to the trial court for proceedings consistent with this Opinion.

■ Because this Court sits in review of the trial court's grant of preliminary objections in the nature of a demurrer, the salient facts are derived solely from the complaint. *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 272 (2005). Pursuant to this standard of review, we accept as true "all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts." *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 910 A.2d 20, 26 (2006) (internal quotation marks omitted).[1] As derived from the allegations in the complaint *sub judice*, the salient facts are as follows.

In March 2004, Eric Connor was a twelve-year-old seventh-grade student at St. Eleanor's School ("St. Eleanor's" or "the School"), a Roman Catholic elementary school located in Collegeville, Montgomery County, and operated by the Archdiocese of Philadelphia ("Archdiocese"). After being assigned to read THE OUTSIDERS, a novel that "glorifies gang fights," the seventh-grade boys developed "a significant interest in knives and weapons." Complaint ¶¶ 14, 19 (filed Apr. 7, 2005). Several boys began bringing their Boy Scout knives to school and showing them off to their classmates.

In the week of March 8, 2004, the sixth and seventh grade boys were engaged in a running feud between the two grades—which historically did not get along—carried out in the schoolyard at recess. On Tuesday, March 9th, after Eric Connor got into a shoving match with a sixth grader, the sixth and seventh grade boys planned a "rumble" for the next day at recess. *Id.* ¶ 21. On the way home from school on Wednesday, March 10th,[2] Eric told a classmate that he planned to bring to school the next day "a miniature 'thing' that could [do] no damage but would be a good bluff." *Id.* ¶ 24.

On Thursday, March 11th, after a classmate of Eric's spoke to St. Eleanor's Principal Sister Mary Marie Heenan ("Sister

---

1. Of course, we need not accept any conclusions of law or argumentative allegations made in the complaint. *Krentz*, 910 A.2d at 26.

2. The complaint does not explain why the rumble did not take place on Wednesday as planned.

Marie") in her office, Sister Marie called Eric to her office and asked him to turn over a penknife that she believed he possessed. Eric denied that he had a knife but produced a manicure set containing "a two-inch nail file along with scissors and letter opener." *Id.* ¶ 33. Soon thereafter, Sister Marie telephoned Eric's mother, Kimberly Connor, and informed her that Eric had brought a "weapon" to school and was being expelled. *Id.* ¶ 29. The next day, the Reverend Patrick Sweeney ("Father Sweeney"), the pastor of St. Eleanor Parish, sent a letter to Eric's parents, informing them that, pursuant to the Parent/Student Handbook of the School, Eric had been expelled for bringing a penknife to school. Exhibit A to Complaint ("Expulsion Letter"); Reproduced Record ("R.R.") at 32a. The Expulsion Letter was shown to "the person who typed it and to various individuals in the school community." Complaint ¶ 70.

On Wednesday, March 17th, all parents and guardians of St. Eleanor's students were sent a letter signed by, *inter alia,* Father Sweeney and Sister Marie. Exhibit C to Complaint ("Information Letter"); R.R. at 34a–35a. The Information Letter related that, on March 11th, Sister Marie received several tips from concerned parents that knives were being brought to school that day. Thereafter, according to the letter, a "specific student ... was found to have a penknife in his possession"; Father Sweeney confirmed the existence of the penknife; and "[t]his student" was expelled from the School. R.R. at 34a.[3] The letter continued by describing further actions that had been taken to defuse tensions at the School and concluded as follows:

> After you have read this, do you have any further suggestions or ideas for us that will help improve the relationships among all of us[:] parents, teachers, staff, and students?
>
> We suggest to you the following:

**3.** Although the letter did not directly state that the item Eric brought constituted a weapon, it did note that School administrators ensured the safety of the students by confirming that "no other weapons were in their personal belongings or their school things." R.R. at 34a.

- Do not fall prey to idle gossip and rumors. If you need more information, call the school. If your call is not returned, call again.
- Speak to your child/ren **individually**[.] [A]s you well know when children are with others their behavior may not reflect what you have taught them. Name-calling and disrespect are learned and imitated behaviors. Remind your child/ren how you expect them to act and how to treat others with respect.
- Am I speaking in front of my children about topics which should only be spoken about in front of adults?
- Have you taught them to be tolerant of others who are different and that a person who may seem different is also a creature of God?
- Have you reviewed the golden rule recently?

We all need to step back during this time and examine our own consciences first[.] We know that we have a plank in our own eyes[,] so I can barely see in order to remove the speck from yours. This is first and foremost a Catholic School and we are Catholics who are called at all times to love God and to respect our neighbor. If each one of us were to arise tomorrow before God what would he say of us, whether parent or teacher or principal[?] We pray that God would be merciful with all of us.

God bless you and keep you[.] May God's light shine upon you and may God grant all of us His peace.

[/s]

Rev. Patrick Sweeney

Pastor

[/s]

Rev. Andrew Brownholtz

Parochial Vicar

[/s]

Sister Marie Heenan, RSM

Principal

[/s]

Mrs. Katherine Schmitt

Vice Principal

R.R. at 35a. Although the above Information Letter did not identify Eric by name, "everyone who saw the letter knew that it referred to Eric as having the pen knife." Complaint ¶ 41.

In addition to sending the above letters, Father Sweeney and Sister Marie made an unspecified number of statements ("Oral Statements")[4] between March 11th and March 20th to various St. Eleanor's parents and students "indicating that Eric had been expelled for having a pen knife and implying that he presented a danger to the school and to the individuals in the school and to the community at large." Complaint ¶ 64. The following week, on March 24, 2004, Eric was enrolled in the local public school district.

On April 7, 2005, Eric's parents, Kimberly and Larry Connor (collectively, "appellants") filed an action in the Court of Common Pleas of Philadelphia County ("trial court") in their own right and on behalf of Eric against the Archdiocese, St. Eleanor's, Father Sweeney and Sister Marie (collectively, "appellees") seeking in excess of $50,000 in compensatory damages and $50,000 in punitive damages. In their complaint, appellants set forth a total of nine counts, four of which are based solely on Eric's expulsion. In particular, Counts I and II allege, respectively, breach of contract and violation of due process grounded in appellants' allegation that Father Sweeney and Sister Marie expelled Eric without sufficient investigation and without providing him with an opportunity to respond; and Counts VI and VII allege, respectively, negligent infliction of emotional distress ("IED") as to Kimberly Connor and intentional IED as to Eric grounded in similar allegations directly related to the decision to expel Eric.

Appellants' complaint also set forth two counts that are based on the Information Letter, the Expulsion Letter, and the Oral Statements (collectively, "Post-expulsion Communica-

4. Although the complaint does not explicitly state whether these statements were written or spoken, the context strongly suggests the latter and appellants' reply brief specifies that the statements were oral, see Reply Brief at 6 n. 2.

tions" or "Communications"). Specifically, Count III alleges defamation, grounded primarily in the Oral Statements; and Count IV alleges defamation, grounded primarily in the Information Letter and the Expulsion Letter.[5]

The remaining three counts of appellants' complaint are based on both Eric's expulsion and the Post-expulsion Communications: Count V alleges negligent IED as to Eric; Count VIII alleges *respondeat superior* liability on the part of the Archdiocese; and Count IX alleges *respondeat superior* liability on the part of St. Eleanor's.

On April 26, 2005, appellees filed preliminary objections pursuant to Pa.R.C.P. 1028 on the following grounds: (1) lack of subject-matter jurisdiction; (2) failure to state a claim upon which relief may be granted and/or lack of specificity; and (3) failure to state a claim against the Archdiocese, Father Sweeney, or Sister Marie.[6] In alleging lack of subject-matter jurisdiction, appellees invoked the deference rule, according to which civil courts decline to exercise jurisdiction over cases that would require them to decide ecclesiastical questions. In particular, appellees cited *Gaston v. Diocese of Allentown*, 712 A.2d 757 (Pa.Super.1998), which, relying on the deference rule, upheld the dismissal, for lack of subject-matter jurisdiction, of

---

**5.** Relevant to Counts III and IV, the complaint also alleges two additional post-expulsion communications that we do not explicitly discuss because appellants do not do so in their Brief to this Court: (1) an address given by a John McGranaghan to the School's sixth and seventh graders about the friction between them in which McGranaghan told the students that Eric had "brought in a knife and had been expelled for it" (Complaint ¶ 39); and (2) a note sent to Kimberly Connor from Karen Thomas, a St. Eleanor's cafeteria worker, that contained "a defamatory statement as to Eric relating to his having acted inappropriately" (Complaint ¶ 72).

**6.** Rule 1028(a) provides, in pertinent, part, that "[p]reliminary objections may be filed by any party to any pleading and are limited to the following grounds:"

 (1) lack of jurisdiction over the subject matter of the action or the person of the defendant . . . ;

 \* \* \* \*

 (3) insufficient specificity in a pleading;

 (4) legal insufficiency of a pleading (demurrer);

 \* \* \* \*

Pa.R.C.P. 1028(a).

negligent and intentional IED claims against a parochial school following the expulsion of a student. In support of their second preliminary objection, appellees offered, with respect to each of appellants' claims, one or more ways in which the pleadings were insufficient to warrant relief. Finally, appellees argued in their third preliminary objection that, to the extent that appellants could state any claim, the proper defendant was St. Eleanor Parish, which, according to appellees, had been incorrectly designated as St. Eleanor's School.

After hearing oral argument, on September 6, 2005, the trial court, per the Honorable Jacqueline F. Allen, sustained appellees' preliminary objections and dismissed appellants' complaint with prejudice. In one paragraph of analysis, the trial court reasoned in its Rule 1925(a)[7] opinion as follows:

> The court finds that it is without subject matter jurisdiction. As drafted, plaintiffs' allegations require the court to determine whether the defendants acted "fairly and according to Catholic principles" with regard to the disciplinary measures employed. Such an endeavor would necessarily require an examination of Catholic principles. The Doctrinal Deference Rule prohibits Pennsylvania courts from such exploration.

Trial Ct. Op., 8/2/06, at 5 (citing *Gaston, supra*).

Appellants appealed to the Superior Court, abandoning the four counts based solely on Eric's expulsion—namely, Counts I (breach of contract), II (due process violation), VI (negligent IED as to Kimberly Connor), and VII (intentional IED). In a published opinion authored by then-Judge, now Justice McCaffery, a three-judge panel of the Superior Court unanimously affirmed, citing the deference rule. *Connor v. Archdiocese of Phila.*, 933 A.2d 92 (Pa.Super.2007). The panel first quoted the *Gaston* court's articulation of the deference rule and its discussion of the rationale behind the rule. The panel then cited this Court's decision in *In re Church of St. James the Less*, 585 Pa. 428, 888 A.2d 795 (2005), where we applied the "neutral principles of law approach," which allows civil

7. Pa.R.A.P. 1925(a).

courts, notwithstanding the deference rule, to exercise jurisdiction over cases involving religious institutions that can be decided based on secular legal authority. The panel proceeded to examine the facts and reasoning set forth in *Gaston,* concluding that that decision prohibits "the courts of this Commonwealth, under the guise of a tort action, [from] review[ing] a decision to expel a student from a parochial school." *Connor,* 933 A.2d at 98.

Acknowledging appellants' contention that Counts III, IV, and V (alleging defamation and negligent IED) were not grounded in their wrongful expulsion allegations, the panel held that the court lacked jurisdiction to consider any of appellants' claims. In this regard, the panel found that appellants' negligent IED claim as to Eric "is based directly upon Appellees' decision to expel Eric without cause." *Id.* at 98–99 (internal quotation marks omitted). The panel further observed that all three of appellants' non-abandoned claims "allege injury as a result of information disseminated **wholly within the parish community.**" *Id.* at 99. Such a decision, the panel held:

> by a religious organization to discuss the fact and import of an ecclesiastical disciplinary decision is, for purposes of the deference rule, no different than the imposition of the discipline itself. This Court would indeed be straying into "the sacred precincts" [*Presbytery of Beaver–Butler of United Presbyterian Church in U.S.A. v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317, 1321 (1985)] if it determined that a religious organization would be subject to civil liability for communicating to its community the existence of a disciplinary decision made and imposed by the organization.

*Connor,* 933 A.2d at 99.

Although noting that review of decisions from other jurisdictions was unnecessary since *Gaston* and prior decisions of this Court provided sufficient guidance, the panel included in its opinion a discussion of several non-binding decisions cited by appellants as well as a brief explanation of the distinction of each case from the instant matter. *See Connor,* 933 A.2d at

100–01 & n. 9 (discussing *Bowie v. Murphy*, 271 Va. 127, 624 S.E.2d 74 (2006), *Ausley v. Shaw*, 193 S.W.3d 892 (Tenn.Ct. App.2005), *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla.1989), and *Calvary Christian Sch., Inc. v. Huffstuttler*, 367 Ark. 117, 238 S.W.3d 58 (2006)).[8]

In conclusion, the panel explained, appellants' defamation and negligent IED claims "essentially hinge upon judicial review of whether officials at a parochial school, in the course of their ecclesiastical disciplinary duties, correctly concluded that the object in Eric's possession, which admittedly contained two or more solid, pointed blade-like implements of at least two inches in length, was a penknife." *Id.* at 102. Accordingly, the panel affirmed the trial court's dismissal of appellants' complaint.

Appellants sought allocatur in this Court, which we granted on September 24, 2008, rephrasing the issue as follows: "Did the Superior Court err in applying the deference rule to [appellants]' negligent infliction of emotional distress and defamation claims?" Because the issue is one of law, our review is plenary. *Mullin v. Commonwealth*, 582 Pa. 127, 870 A.2d 773, 778 (2005).

The U.S. Supreme Court first articulated what has come to be known as the deference rule in *Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1872). *Watson* was a dispute

---

**8.** The panel also distinguished the case *sub judice* from *Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105 (1975), in which this Court declined to dismiss the tort suit of a plaintiff who had been shunned by the members of his former church at the direction of the defendant-bishops. Relying on *Bear*, appellants argued below that they had "set forth a cause of action based on [Eric's] virtual shunning from the community because of false statements uttered by Reverend [ ] Sweeney and Sister [ ] Marie." *Connor*, 933 A.2d at 101 (quoting Appellants' Superior Ct. Brief) (alterations in original). Unlike the plaintiff in *Bear*, the panel determined, appellants here "did not allege any facts showing that Appellees directed a 'shunning' of Appellants or that Appellees acted in a manner that excessively interfered with the maintenance of marriage and family relationships, alienation of affection, or the tortious interference with business relationships." *Connor*, 933 A.2d at 101 (emphasis omitted).

Because appellants have abandoned the "shunning" argument that they raised before the Superior Court, we do not address this aspect of the Superior Court's decision.

over real property between the church situated on the property and the national denomination to which the church belonged. The dispute arose in May 1865, just after the end of the Civil War, when the governing body of the national denomination, the General Assembly of the Presbyterian Church in the United States of America, adopted a resolution requiring members of every local church to renounce slavery. Thereafter, a local church in Louisville, Kentucky, rebelled against the resolution by electing pro-slavery officers to manage the church property. Anti-slavery members of the church then sued in state court to contest the validity of the election. Having failed to obtain relief there, anti-slavery members who were citizens of Indiana sued in federal court, raising the more general question of which of the two competing factions was entitled to use of the local church. Claiming that the pro-slavery officers of the local church had effectively seceded from the national denomination, the anti-slavery members initially prevailed. On appeal to the U.S. Supreme Court, the pro-slavery members argued that the national denomination had forfeited control of the local church's property by passing the anti-slavery resolution because the resolution departed from basic principles of the faith pursuant to which the local church was founded.

Early on in his opinion for the Court, Justice Samuel Freeman Miller, an appointee of President Abraham Lincoln, emphasized that this was "a case of a division or schism in [a] church" and that the question raised was, essentially, which of two competing factions should be recognized as having lawful control over the management of the church's property. *Watson*, 80 U.S. at 717. Accordingly, the Court framed its analysis by distinguishing among three distinct categories of church property disputes. The first category that the Court recognized was composed of cases in which the church property in dispute was held in express trust to sustain certain church doctrine or principles, and the dispute concerned whether the property was being used in violation of such doctrine or principles. In such cases, the courts "can prevent the diversion of the property . . . to other different uses" just

as courts do in equity cases with respect to charities. *Id.* at 723.

The other two categories of cases both concern implied trusts—but whereas the second category includes cases in which the local church is not governed by a national denomination, the third category is comprised of cases in which there is such a hierarchy of church governance. As for the second category, the *Watson* Court noted that the dispute must be resolved by application of "the ordinary principles which govern voluntary associations." *Id.* at 725.

It is the third, most common category, to which the *Watson* case belonged. In such cases, the Court noted, the local church is bound by the orders and judgments of the ecclesiastical bodies that are superior to it. With respect to "this class of cases" of disputes over church property, the Court set forth its original articulation of the deference rule, as follows:

> [W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 727.

After noting that the English courts did not observe this rule of deference to ecclesiastical bodies in such cases, the *Watson* Court proceeded to explain the underpinnings of this new American rule. In language that would later be repeated time and again in explanation of the more general doctrine of separation of church and state,[9] Justice Miller wrote for the Court:

9. *See, e.g., Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (quoting *Watson* in invalidating state statutes forbidding teaching of evolution in public schools and in publicly funded colleges and universities); *Sch. Dist. of Abington Twp., Pa. v. Schempp,* 374 U.S. 203, 243, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (quoting *Watson* in invalidating, *inter alia,* Pennsylvania statute providing for Bible reading in public schools).

590

In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It

would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

*Id.* at 728–29. As emphatic as the *Watson* Court was in refusing to decide questions of "ecclesiastical law and religious faith," however, the Court was careful to note that not all decisions made by church authorities related to such doctrinal questions. Thus, the Court conceded that, for example:

> if the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up.

*Id.* at 733. "But it is a very different thing," the Court reasoned, where the dispute concerns "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the church to the standard of morals required of them." *Id.* at 733.

Applying the rule as set forth above, the *Watson* Court declined the invitation of the pro-slavery members of the local church to examine the General Assembly's articulation of Presbyterian doctrine as reflected by its 1865 anti-slavery resolution. Accordingly, the local church property remained in the control of the anti-slavery faction.

Notwithstanding the sweeping language in which the High Court indulged when justifying the deference rule, *Watson* did not explicitly rest on constitutional grounds.[10] Indeed, it was not until eighty years later that the deference rule was

---

**10.** Nor did the Court consult state court decisions, as the question was treated as one of federal common law pursuant to the then-governing rule of *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), *overruled by Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

constitutionalized in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Another dispute over church property, *Kedroff* involved the New York City cathedral of the Russian Orthodox Church. In 1945, the New York Legislature enacted a statute recognizing the administrative autonomy of the Russian Orthodox churches located in North America from the Orthodox authorities in the communist Soviet Union. The New York courts upheld the constitutionality of the statute and the right of the North American churches' elected hierarch of the archdiocese of North America to use the cathedral. On appeal, the U.S. Supreme Court reversed, holding that the New York Court of Appeals "intrude[d] for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.* at 119, 73 S.Ct. 143. In so holding, the *Kedroff* Court explicitly entrenched the deference rule in constitutional footing:

> *Watson v. Jones* ... radiates[ ] [ ] a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.

*Kedroff,* 344 U.S. at 116, 73 S.Ct. 143.

The third decision in the U.S. Supreme Court's line of church property disputes that gave rise to the deference rule is *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Much like *Watson,* the *Mary Elizabeth* case arose when two Georgia churches withdrew from the national Presbyterian Church, claiming that various actions and pronouncements of the national Church, including the ordination of women, departed from the doctrines and practices that existed at the time the local churches

were founded. After a trial, the jury returned a verdict in favor of the local churches, finding that the national Church had substantially abandoned its original tenets and doctrines, and the verdict was upheld by the Georgia Supreme Court. On appeal, the U.S. Supreme Court reversed. After quoting extensively from *Watson,* the *Mary Elizabeth* Court noted that "[t]he logic of this language leaves the civil courts no role in determining ecclesiastical questions in the process of resolving property disputes." *Id.* at 447, 89 S.Ct. 601.

Nevertheless, echoing *Watson,* the *Mary Elizabeth* Court repeated that "not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment." *Id.* at 449, 89 S.Ct. 601. Indeed, signaling the existence of a kind of competing canon of resolving church property disputes, the *Mary Elizabeth* Court recognized that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Id.* In the case before it, however, the *Mary Elizabeth* Court held that the question submitted to the jury—*i.e.,* "whether actions of the general church constitute such a 'substantial departure' from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated"—simply could not be resolved by applying neutral principles of trust law. *Id.* at 450, 89 S.Ct. 601.

Seven years later, the U.S. Supreme Court broadened the reach of *Watson* and *Mary Elizabeth* beyond the property dispute context. In *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), the Court held that the First Amendment principle " 'command[ing] civil courts to decide church property disputes without resolving underlying controversies' . . . applies with equal force to church disputes over church polity and church administration." *Id.* at 710, 96 S.Ct. 2372 (quoting *Mary Elizabeth,* 393 U.S. at 449, 89 S.Ct. 601). Noting that the case before it "essentially involve[d] not a church property dispute, but a religious dispute," *id.* at 709,

96 S.Ct. 2372,[11] the *Serbian* Court reversed the decision of the Illinois Supreme Court, which "rest[ed] upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitute[d] its own inquiry into church polity and resolutions based thereon of those disputes," *id.* at 708, 96 S.Ct. 2372.

*Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) is the most recent of the High Court's deference rule cases. In *Jones,* after the majority of a local Presbyterian church voted to switch allegiances from one to another Presbyterian denomination, the minority remnant sued to establish its right to the local church property. Applying neutral principles of law pursuant to *Mary Elizabeth,* the Georgia courts determined that the majority members of the local church had the right to take the property with them. Although it remanded for further proceedings, the U.S. Supreme Court essentially affirmed on appeal in a 5–4 decision. Emphasizing the virtues of the neutral principles approach, Justice Blackmun wrote for the Majority:

> The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties.

*Jones,* 443 U.S. at 603, 99 S.Ct. 3020. In response to the dissenters' view, the Majority rejected the suggestion "that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved." *Id.* at 605, 99 S.Ct. 3020. Even so,

11. The dispute was actually two-fold: (1) the validity of the removal of an anti-communist bishop in Illinois by the Serbian Eastern Orthodox "Mother Church" in then-communist Yugoslavia; and (2) whether the Mother Church had the authority to divide the American–Canadian Diocese into three new dioceses.

the *Jones* Majority reaffirmed the vitality of the deference rule, at least with respect to church property disputes, noting that, whenever "the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* at 604, 99 S.Ct. 3020 (citing *Serbian,* 426 U.S. at 709, 96 S.Ct. 2372).

Because church property disputes—like most real property cases—usually are first heard in state court, it should come as no surprise that Pennsylvania judges have long been familiar with the special problems inherent in intra-church controversies. When the U.S. Supreme Court first set forth the deference rule in *Watson* in 1872, this Court had already been expounding the principle in similar terms for decades. In fact, the Commonwealth's jurisprudence was so notable in this area that the High Court in *Watson* professed itself unable to "better close [its] review of the authorities than in the language of the Supreme Court of Pennsylvania, in the case of *German Reformed Church v. [Commonwealth ex rel.] Seibert,*" 3 Pa. 282, 3 Barr. 282, 291 (1846):

> The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt which would do anything but improve either religion or good morals.

*Watson,* 80 U.S. at 732.[12]

Nevertheless, it was not until 1985 that this Court had occasion to explicitly recognize the deference rule as set forth

___

12. Another early decision of this Court similarly observed:

> Differences of opinion are the natural result of moral, spiritual, and social growth, and are unavoidable in every religious denomination. In the development of the human race changes in spiritual matters

in *Watson.* In *Presbytery of Beaver–Butler of the United Presbyterian Church in the United States of America v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317 (1985), the majority of congregants of a local church voted to sever its affiliation with the national denomination to which it belonged, as in *Jones v. Wolf, supra,* although in *Beaver–Butler* it was the denomination that sued. On cross-motions for summary judgment, the trial court ruled in favor of the local church, finding no original agreement of trust placing the church property in the control or ownership of the national denomination. On appeal, the Commonwealth Court reversed, holding that the local church was bound by the decision of the highest tribunal of the national denomination to retain the property.[13]

In a unanimous decision authored by Justice James T. McDermott, this Court reversed, holding that the Commonwealth Court erred in applying the deference rule. Justice McDermott began his discussion by eloquently describing the continuing vitality of both the deference rule and the neutral principles of law approach:

> The wisdom of the *Watson* Court is as clear now as it ever was: the right to practice one's belief and worship as one chooses is so deep a root of our constitutional culture that a court, even one with the best intentions, can be no more than a clumsy intruder into the most delicate and

must necessarily follow if the race is to continue to progress. The questions of doctrine and principles arising in religious denominations from time to time are for the determination of the members, through their duly appointed representatives, in the manner provided by church law, and the civil courts will not undertake to determine between one theory and another, so long as there appears no serious departure from the generally accepted teachings of the organization, coupled with an attempt to divert church property to a purpose radically different from that for which it was acquired.
*Commonwealth ex rel. Heil v. Stauffer,* 289 Pa. 139, 137 A. 179, 182 (1927) (quoting *Nagle v. Miller,* 275 Pa. 157, 118 A. 670, 672 (1922)); *see also Irvine v. Elliott,* 206 Pa. 152, 55 A. 859, 860 (1903) (*per curiam*) (noting that this Court "is not a court of review of the proceedings of ecclesiastical courts").

13. *Presbytery of Beaver–Butler of United Presbyterian Church U.S.A. v. Middlesex Presbyterian Church,* 80 Pa.Cmwlth. 211, 471 A.2d 1271 (1984).

sensitive areas of human life. When Caesar enters the Temple to decide what the Temple believes, he can leave behind only his own views. The view of a court as to who are heretics among warring sects is worth nothing, and must count as nothing if our cherished diversity of religious views is to prevail.

\* \* \* \*

All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine. While it is true that parties may agree to settle their disputes according to their own agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts. From this consideration has evolved what is called the "neutral principles approach" delineated in *Presbyterian Church in the United States v. [Mary Elizabeth] Blue Hull Memorial [Presbyterian] Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), where the rule was carefully announced.

*Beaver–Butler*, 489 A.2d at 1320–21.[14] After reviewing the U.S. Supreme Court's decisions in *Watson, Kedroff, Mary Elizabeth*, and *Jones v. Wolf*, Justice McDermott framed the *Beaver–Butler* dispute in terms of a competition between the deference rule and the neutral principles of law approach. Here, Justice McDermott concluded, the Commonwealth Court erred in

accept[ing] that the question was one of deference and yield[ing] the issue to the judicature of UPCUSA. We believe, under the circumstances, they went further than required. Indeed they seemed to have mandated deference simply because there existed a judicature in the national

14. The "neutral principles" approach actually had already been applied by this Court in two lesser known cases. *See W. Pa. Conference of United Methodist Church v. Everson Evangelical Church of N. Am.*, 454 Pa. 434, 312 A.2d 35 (1973); *St. Michael & Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 451 Pa. 176, 301 A.2d 655 (1973).

church body. They would have been correct if the issue was doctrinal[;] it however is, whether there ever existed an agreement at all: an issue that requires no doctrinal exegesis.

*Beaver–Butler*, 489 A.2d at 1322. Applying neutral principles of trust law—most notably, the requirement, in the absence of an express trust, of clear and unambiguous language or conduct indicating the intent to create a trust—the *Beaver–Butler* Court found no evidence that the local church ever intended to convey its property interests to the national denomination.

Following *Beaver–Butler*, the Commonwealth Court has repeatedly employed the "neutral principles" approach to resolve subsequent church property disputes. *See Presbytery of Donegal v. Calhoun*, 99 Pa.Cmwlth. 300, 513 A.2d 531 (1986); *Presbytery of Donegal v. Wheatley*, 99 Pa.Cmwlth. 312, 513 A.2d 538 (1986); *Mikilak v. Orthodox Church in Am.*, 99 Pa.Cmwlth. 264, 513 A.2d 541 (1986); *Bd. of Bishops of Church of Living God v. Milner*, 99 Pa.Cmwlth. 612, 513 A.2d 1131 (1986); *Orthodox Church of Am. v. Pavuk*, 114 Pa. Cmwlth. 176, 538 A.2d 632 (1988); *Conference of African Union First Colored Methodist Protestant Church v. Shell*, 659 A.2d 77 (Pa.Cmwlth.1995). This Court recently reaffirmed *Beaver–Butler* in resolving the church property dispute presented in *In re Church of St. James the Less*, 585 Pa. 428, 888 A.2d 795 (2005).

We further note at the outset that the courts of this Commonwealth previously have applied secular principles of law to certain suits brought against Roman Catholic schools. *See, e.g., Vojtasek v. Diocese of Allentown*, 916 A.2d 637 (Pa.Super.2006) (civil suit brought by former Catholic high school student against diocese, school, and bishops alleging sexual abuse by school's vice-principal and disciplinarian); *Bishop Leonard Regional Catholic Sch. v. Unemployment Comp. Bd. of Review*, 140 Pa.Cmwlth. 428, 593 A.2d 28 (1991) (suit seeking unemployment compensation benefits brought by teacher discharged from Catholic grade school). Although the defendants apparently did not challenge the subject-matter jurisdiction of the courts in these cases, the courts did not

raise the question *sua sponte* either. As this Court noted in *Beaver–Butler*, 489 A.2d at 1322, deference is not "mandated [ ] simply because there exist[s] a judicature in the [defendant-]church."

Instantly, appellants argue that resolving their two defamation claims and their non-abandoned negligent IED claim "does not require the interpretation of any religious principle or dogma of the Roman Catholic Church." Appellants' Brief at 21. Conceding that review of Eric's expulsion would "require[ ] an intrusion into [ ] religious principles" (*id.* at 28), appellants emphasize that they no longer challenge Eric's expulsion and do not seek his readmission to the School. Accordingly, appellants contend, the success of their claims depends not on whether Eric's expulsion was justified but on whether Father Sweeney and Sister Marie falsely stated that Eric brought a weapon to school and that he posed a danger to the School and to the community. Similarly, while appellants concede that the deference rule would apply if appellees "had publically described Eric as a liar or a bad [C]atholic" (*id.* at 29), appellants note that the Roman Catholic Church holds no official position on the purely secular question of what constitutes a weapon or a penknife. Indeed, appellants assert, each element of the three claims can be met by applying neutral principles of law—that is, without addressing any issue of Catholic doctrine. Therefore, appellants argue, the Superior Court erred in relying on *Gaston v. Diocese of Allentown*, 712 A.2d 757 (Pa.Super.1998), because, unlike the plaintiffs in that case, appellants do not seek damages for the expulsion decision itself but, rather, for statements made subsequent to the expulsion. Appellants leave open the possibility that, after discovery, appellees might be able to obtain summary judgment after somehow substantiating their assertion that resolution of appellants' claims would involve the interpretation of Catholic principles. But, at this stage, appellants argue, no such proof exists to justify the trial court's dismissal of the matter on the pleadings.

Proceeding beyond the facts of the case *sub judice*, appellants complain that, by applying the deference rule to the

instant case, the Superior Court has provided clergypersons with absolute immunity against defamation claims. Appellants maintain that holding clergy liable for defamatory statements that do not relate to religious doctrine would result in no impairment of the free exercise of religion. Instead of protecting this First Amendment guarantee of freedom of religion, according to appellants, declining to impose liability on clergy and religious institutions for such statements would actually lead to the establishment of religion, in contravention of the other protective guarantee of the First Amendment. Turning to extra-jurisdictional decisions, appellants first discuss the four cases addressed by the Superior Court, then mention several others that they contend support their position.

Appellees counter that the neutral principles approach, "by definition, does not extend to tort causes of actions [sic]" because a tort is an unforeseen wrong, as opposed to an anticipated contractual event that can be "design[ed] ... through secular documents." Appellees' Brief at 6 (citing non-binding extra-jurisdictional decisions). Indeed, appellees assert that no Pennsylvania court has ever applied neutral principles outside the context of real property disputes. *Id.* at 7 (quoting *Beaver–Butler,* 489 A.2d at 1323, as noting that neutral principles approach may apply "in cases where the resolution **of a property dispute** involves no inquiry into ecclesiastical questions") (emphasis appellees'). In non-property cases, appellees contend, the Commonwealth's lower courts have consistently applied the deference rule. *See id.* at 8–9 (citing, in addition to two trial court decisions, *Poesnecker v. Ricchio,* 158 Pa.Cmwlth. 459, 631 A.2d 1097 (1993), *Atterberry v. Smith,* 104 Pa.Cmwlth. 550, 522 A.2d 683 (1987), and *In re St. Clement's Church,* 687 A.2d 11 (Pa.Cmwlth.1996)). In particular, appellees rely on *Gaston, supra,* which they describe as an analogous case in which a prior Superior Court panel held that civil courts should defer to "the decisions of religious schools concerning their administration and, in particular, regarding their enforcement of discipline." Appellees' Brief at 10.

Turning to the facts of the instant case, appellees contend that the decision to expel Eric—as well as the Post-expulsion Communications of that decision—"cannot be surgically excised" from doctrine of the Roman Catholic Church. *Id.* at 13. Noting that all three of appellants' remaining claims arise out of the expulsion decision, appellees argue that "[i]f the expulsion was proper—*i.e.*, in accordance with Catholic principles and discipline—then none of the comments allegedly made during the expulsion process are subject to a defamatory meaning." *Id.* at 15. In support of the religious roots of both the expulsion and the Communications, appellees quote liberally from the St. Eleanor's Student/Parent Handbook, which directs that students "act in ways 'that convey respect to God, self, teachers, adults and other students' "; that St. Eleanor's teachers "teach by word and example"; that School officials should discipline students with an eye toward "applying 'Christ's teachings and moral values to life in contemporary society' "; and that discipline itself is to be regarded as a " 'necessary reflection of the philosophy of a Catholic School.' " *Id.* at 15–16 (quoting R.R. at 40a–41a). In addition, appellees note that the Information Letter asked St. Eleanor's parents and guardians "to teach tolerance of all 'creature[s] of God' " and "emphasized that 'we are Catholics who are called at all times to love God and to respect our neighbor.' " *Id.* at 14 (quoting R.R. at 34a–35a) (alteration in original). Thus, appellees argue, the Communications were "part of the teaching and disciplinary process" in that they "provided example of the religious values of the school to parent and student alike." *Id.* at 16.

In response to the extra-jurisdictional decisions cited by appellants, appellees assert that "the overwhelming weight" of jurisdictions apply the deference rule in tort cases. Appellees' Brief at 18. Appellees provide two lists of cases from other jurisdictions that have applied the deference rule in cases involving defamation claims. The first list is comprised of defamation actions brought by members of religious institutions against leaders of those institutions. The allegedly defamatory statements in these cases ranged from accusations

of bigamy in two of these cases to determinations, in three other cases, of moral unfitness for church membership. The other series of decisions cited by appellees involves, in their own words, "statements about the fitness of a church leader." *Id.* at 20. As for appellants' authorities, appellees dismiss them as "nearly exclusively [ ] non-binding, mostly unpublished, and ultimately unpersuasive." *Id.* at 21.

Finally, like appellants, appellees bring their own policy arguments to bear in support of their position. Most notably, appellees warn that allowing claims like appellants' to proceed would signal to disgruntled members of the Commonwealth's religious institutions that they can use creatively pleaded tort claims to second-guess ecclesiastical decisions.[15]

In a Reply Brief, citing two Superior Court cases, appellants refute appellees' assertion that the neutral principles approach is absent in Pennsylvania jurisprudence outside the context of property disputes. *See* Reply Brief at 8 (citing *Cooper v. Church of St. Benedict*, 954 A.2d 1216 (Pa.Super.2008) and *Rankin v. Phillippe*, 206 Pa.Super. 27, 211 A.2d 56 (1965)). In response to appellees' contention that "the overwhelming weight" of jurisdictions applies the deference rule in tort cases, appellants cite various federal decisions and decisions from several other jurisdictions applying neutral principles to

---

15. As alternative grounds for affirming the decision of the Superior Court, appellees offer that Counts III, IV, and V (the non-abandoned claims set forth in appellants' complaint) do not properly plead either a defamation claim or a negligent IED claim. *See* Appellees' Brief at 25–28. In their Reply Brief, appellants respond that the lower courts declined to address these arguments and that this Court similarly declined to broaden our review by granting allowance of appeal solely to consider the applicability of the deference rule. As appellants note, appellees' alternative grounds for affirmance are distinct issues beyond the scope of our grant of allowance of appeal. Given these circumstances, we will decline to address the alternative grounds in this Opinion, without prejudice to appellees' ability to raise them upon remand in the trial court. *See, e.g., Siekierda v. Dep't of Transp., Bureau of Driver Licensing*, 580 Pa. 259, 860 A.2d 76, 77 n. 2 (2004) (declining to address appellee's additional issues that were not reached below given lower courts' disposition in his favor and remanding matter for further proceedings to trial court where appellee would be free to litigate his additional issues).

adjudicate tort claims.[16] Appellants request that we reverse the Superior Court's order affirming the trial court's grant of appellees' preliminary objections, and remand for further pre-trial proceedings.

In a brief submitted in support of appellees, the Pennsylvania Catholic Conference argues as *amicus curiae* that appellants' emphasis on the fact that they no longer challenge Eric's expulsion is unavailing. According to the Conference, whether appellants seek to overturn the expulsion (by claiming that appellees wrongly **perceived** the nature of Eric's alleged weapon), or seek to exact a monetary penalty for appellees' communicating the reason for the expulsion (by claiming that appellees wrongly **characterized** the nature of Eric's alleged weapon), appellees seek to have the government penalize religiously motivated conduct. It is no less inhibiting of religious activity for a civil court to impose sanctions on an act of religious discipline, the Conference contends, than it is for a civil court to impose sanctions on the drawing of a religious lesson for the faithful about that act of discipline.

Because both appellees and the panel's decision below rely to a significant extent on the Superior Court's decision in *Gaston, supra,* we begin our analysis with a review of that case. Like the case *sub judice, Gaston* arose out of an expulsion decision made by a Roman Catholic elementary school. After their son and daughter were expelled by the school, the Gastons filed a complaint on behalf of their children and in their own right seeking compensatory and punitive damages for the children's expulsion "without cause." The Gastons' complaint alleged negligent and intentional IED on the part of the school's principal, the diocese that operated the school, and the diocese's department of education. More specifically, the Gastons alleged that their children had been expelled in retaliation for the Gastons' criticism of a course that their son, Joseph, was then taking that the course's students were instructed not to discuss outside the classroom or even remove the course textbook therefrom. According to

16. We mention many of these decisions, as well as many of those cited by appellees, in our analysis below.

the complaint, within a month after the Gastons sent a letter criticizing the course to the school principal, the principal reported to the police that Joseph had made threats against her and that both Gaston children had become "discipline problems." *Gaston*, 712 A.2d at 758. That same day, the Gaston children were expelled. Thereafter, the expulsion decision was ratified both by the bishop of the diocese and, in turn, by the diocese's department of education after a hearing.

In the trial court, the defendants filed preliminary objections seeking dismissal for, *inter alia*, lack of subject-matter jurisdiction. Applying the deference rule, the court sustained the objections and dismissed the complaint, citing *Beaver–Butler, supra.* The Gastons appealed to the Superior Court, raising as their sole issue whether the trial court had subject-matter jurisdiction over the Gastons' "suit sounding in negligence even though one of the parties was a religious institution," *i.e.*, the diocese. *Id.*

In an opinion authored by Judge Vincent A. Cirillo, a three-judge panel of the Superior Court affirmed. The panel first set forth the origins of both the deference rule and the neutral principles approach, reviewing this Court's *Beaver–Butler* decision and the High Court's decisions in *Watson, Kedroff,* and *Mary Elizabeth.* After noting that this Court adopted the neutral principles approach in *Beaver–Butler,* the panel proceeded to the following two-paragraph analysis of the matter before it:

> The question here, however, is not a property or contractual dispute. It is a claim that hints at tort law, but is based on an expulsion decision ratified by a bishop; it is, in our opinion, not receptive to application of neutral principles of law. The Catholic school's disciplinary code and review of expulsion involve matters of church doctrine. Absent allegations of acts against the public welfare or acts of immorality, or allegations of "excessive interference within areas of paramount state concern, i.e. the maintenance of marriage and family relationship, alienation of affection, and the tortious interference with a business relationship, which the courts of this Commonwealth may have authority to

regulate, even in light of the 'Establishment' and 'Free Exercise' clauses of the First Amendment[,]" this court is loath to interfere with a bishop's decision on student expulsion. *Bear [v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975) ].

The parochial school, synonymous with the installation of dogma and discipline in its students, is an integral part of the Roman Catholic Church. The school is a repository for Catholic tradition and scripture; it is so intertwined with the church doctrine that separation is neither pragmatic nor possible. Intrusion into the bishop's decision on matters concerning parochial school discipline and expulsion places this court perilously close to trespassing on sacred ground.

*Gaston,* 712 A.2d at 760–61 (citation omitted) (alteration in original).

Based on the above rationale of *Gaston,* the instant Superior Court panel—which, of course, was bound by *Gaston*—concluded as follows:

It is clear from *Gaston* that it is not within the purview of the courts of this Commonwealth, under the guise of a tort action, to review a decision to expel a student from a parochial school. Appellants' arguments that their defamation and negligent [IED] claims are somehow separate and apart from the decision to expel Eric are wholly unpersuasive. First, the negligent [IED] claim is based directly upon Appellees' decision to expel Eric "without cause." (Complaint at ¶ 85). Clearly, under the deference rule, we may not review the question of whether a student was appropriately expelled from or otherwise disciplined by a school operated solely by a religious organization. Moreover, *Gaston* determined that an action in intentional [IED] made against a religious organization, based directly upon the expulsion of children from a parochial school, may not be reviewed by the courts pursuant to the deference rule. There is no discernable reason why the same disposition should not apply to an action made against a religious

organization based upon the expulsion of a parochial school student grounded in negligent [IED].

*Connor*, 933 A.2d at 98–99.

As appellants emphasize before this Court, they, unlike the Gastons, no longer challenge the decision to expel their child from school. Instead, appellants now seek damages only for communications that appellees allegedly made subsequent to the decision to expel appellants' son. Instantly, the Superior Court panel essentially concluded that this was a distinction without a difference, opining that appellants' claims were "based directly upon" the expulsion decision. For the reasons set forth throughout our discussion, we conclude that appellants' complaint treads much further into secular territory than the mere "hint[ ] at tort law" that was deemed to be before the *Gaston* court.

The instant panel held that merely subjecting a religious institution to civil liability for communicating to its community the occurrence of a disciplinary decision would require the court to "stray[ ] into 'the sacred precincts,'" *Connor*, 933 A.2d at 99 (quoting *Beaver–Butler*, 489 A.2d at 1321). In making such a conclusory assertion, the panel failed to focus on the actual elements of appellants' claims to determine whether the claims could be resolved based on secular authority. We think that the question of whether to apply the deference rule requires a deeper analysis of the substance of the claims set forth in the complaint than was made by the panel.

In contrast to the panel below, appellees do make reference to the substance of appellants' claims in arguing that their resolution would require consideration of religious authority, although appellees confine their argument to appellants' defamation claims. Focusing on their own prospective showing concerning the defamatory character of the statements, appellees argue that "[i]n order to determine the truth of the allegedly defamatory statements" that appellees made in the Post-expulsion Communications, the trial court would "be led into an examination of the [S]chool's disciplinary decision and,

by necessity, into an examination of Catholic doctrine." Appellees' Brief at 15. Although appellees' argument is more focused than that of the Superior Court, we do not find it persuasive for the reasons set forth below.

█ Thanks in part to the diligent research efforts of the parties *sub judice,* we have conducted an exhaustive survey of the deference rule jurisprudence that has developed in the various federal circuits and in our sister jurisdictions. Our research has convinced us that the most thorough and persuasive analyses are yielded by a claim-by-claim, element-by-element approach to the question of whether to apply the deference rule.[17] *See, e.g., Petruska v. Gannon Univ.,* 462 F.3d 294, 309–10 (3d Cir.2006) (considering each claim in isolation in determining applicability of deference rule and setting forth elements necessary to prevail on each claim); *Klagsbrun v. Va'ad Harabonim of Greater Monsey,* 53 F.Supp.2d 732, 739 (D.N.J.1999) ("To determine whether the Establishment Clause prohibits this court from exercising jurisdiction over this matter, this court must consider the specific elements of the plaintiffs' [defamation] claim."); *Marshall v. Munro,* 845 P.2d 424, 428 (Alaska 1993) (setting forth elements of claim); *Olson v. First Church of Nazarene,* 661 N.W.2d 254, 261–66 (Minn.Ct.App.2003) (considering each claim in isolation); *Roman Catholic Diocese of Jackson v. Morrison,* 905 So.2d 1213, 1239–43 (Miss.2005) (considering each claim in isolation and noting that "each cause of action asserted against a religious organization claiming First Amendment protection[ ] must be evaluated according to its particular facts"); *McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840, 857 (2002) (noting that protections afforded to religious institutions by First Amendment "are highly nuanced and not monolithic" and requiring that "each and every claim contained in [ ] complaint" be analyzed "to determine whether adjudication would require a determination of competing reli-

17. We mention decisions from other jurisdictions here and throughout our discussion not in an attempt to analogize their factual scenarios to the facts *sub judice* but, rather, in order to identify a deference rule approach that yields analyses that are both persuasive and consistent with Pennsylvania jurisprudence.

gious visions or interfere with church administration or choice"); *see also Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468 (8th Cir.1993) (dismissing only certain claims under deference rule and allowing others to proceed to trial); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir.1989) ("We look [in determining whether deference rule applies] to the substance and effect of plaintiffs' complaint, not its emblemata.");[18] *Calvary Christian Sch., Inc. v. Huffstuttler*, 367 Ark. 117, 238 S.W.3d 58, 67 (2006) (same); *Marshall, supra* (same); *Madsen v. Erwin*, 395 Mass. 715, 481 N.E.2d 1160 (1985) (same). Therefore, we conclude that in determining whether to apply the deference rule, the fact-finding court must: (1) examine the elements of each of the plaintiff's claims; (2) identify any defenses forwarded by the defendant; and (3) determine whether it is reasonably likely that, at trial, the fact-finder would ultimately be able to consider whether the parties carried their respective burdens as to every element of each of the plaintiff's claims without "intruding into the sacred precincts," *Beaver–Butler*, 489 A.2d at 1321.

Instantly, appellants have preserved for appeal Counts III, IV, and V of their complaint.[19] In particular, the complaint sets forth the following pertinent allegations:

- Count III alleges that Father Sweeney and Sister Marie knowingly made numerous false statements to St. Eleanor's students and parents to the effect that Eric was expelled for bringing a penknife to school and that he posed a danger to the School and community;
- Count IV alleges that Father Sweeney and Sister Marie distributed the Information Letter to all St. Eleanor's parents, guardians, and students, constructively identifying Eric as having been expelled for bringing a penknife to the School; and that Father Sweeney showed the

18. *Accord Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir.2008); *Westbrook v. Penley*, 231 S.W.3d 389, 405 (Tex.2007).

19. Appellants do not address whether they also seek to preserve Counts VIII and IX, alleging *respondeat superior* liability, to the extent those counts rely on the Post-expulsion Communications. Resolution of this question is not necessary for purposes of today's decision.

Expulsion Letter actually identifying Eric to the person who typed it and "to various individuals in the school community"; and

- Count V alleges that Father Sweeney and Sister Marie negligently inflicted emotional distress upon Eric by making the above statements.

Appellants further allege in all three counts that each of the above Post-expulsion Communications resulted in reputational, psychological, and physical damages to appellants and their son.

 Taking Count V first, appellees do not discuss whether the trial court could consider appellants' proof and any defenses offered by appellees as to the above elements of a negligent IED claim without intruding into the "sacred precincts." [20] It is appellees, as the party seeking dismissal on the pleadings, who must make such a showing, and we will not make appellees' arguments for them. *See Cianfrani v. Common-wealth,* 505 Pa. 294, 479 A.2d 468, 469 (1984) ("A preliminary objection in the nature of a demurrer is not to be sustained and the complaint dismissed unless the law says with certainty that no recovery is possible. Therefore, if any theory of law will support the claim raised by the petition, a dismissal is improper.") (citation omitted); *Krentz v. Consol. Rail Corp.,* 589 Pa. 576, 910 A.2d 20, 26 (2006) ("Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.") (internal quotation marks omitted). Therefore, we vacate the trial court's order to the extent that it dismissed appellants' non-abandoned negligent IED claim, but we do so without prejudice, as explained below, to appellees' opportunity to forward distinct arguments in support of dismissal of the claim pursuant to the element-specific approach to the deference rule that we announce today.

 We next proceed to consider appellants' proof and any defenses offered by appellees with respect to the elements of

---

20. Instead, appellees focus on appellants' defamation claims as inevitably dragging the trial court into the ecclesiastical thicket. *See, e.g.,* Appellees' Brief at 14–18.

appellants' defamation claims. Section 8343 of the Judicial Code provides as follows:

**(a) Burden of plaintiff.**—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

**(b) Burden of defendant.**—In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

42 Pa.C.S. § 8343.

Appellees did not file an answer to appellants' complaint, and their preliminary objections only alleged generally that the deference rule applied simply because appellants' claims "ar[ose] out of disciplinary matters at" St. Eleanor's, a parochial school. R.R. at 53a.[21] That position no doubt was

---

**21.** While appellees' Memorandum of Law in Support of Preliminary Objections did offer certain grounds for their objection that appellants had failed to state a claim upon which relief could be granted, appellees' challenges to the merits of appellants' claims were generally secular in nature. *See* R.R. at 67a (arguing that appellants failed to plead defamatory statements with sufficient specificity); *id.* at 70a–71a (arguing that appellants' negligent IED claims could not co-exist with their breach-of-contract claim); *id.* at 70a–71a (arguing that appellants failed to plead physical harm or injury in support of negligent IED

premised upon a hope that *Gaston* would be given broad interpretation, and indeed the lower courts gave it such a reading. The absolutist nature of the objection is reason enough to hold that it should fail under the more discreet approach to the deference rule that we approve today. We recognize, however, that appellees did not seek to satisfy the elements-based approach we have approved, and they should be free to renew a preliminary objection, upon remand, if they believe they can succeed in satisfying that test.

We further recognize that appellees have forwarded a more sophisticated argument on this appeal that they did below, an argument that touches more particularly upon concerns that litigation of the defamation claims will intrude into doctrinal areas.[22] Since the argument is at least partially responsive to the approach that we approve today, and since the matter has been ably briefed on both sides, we will engage the argument. We stress that the ensuing analysis is based on the record as it currently exists.

The proper focus starts by isolating the elements of appellants' defamation claims that would actually be in dispute at trial. It appears that, if the defamation claims proceeded to trial, appellees would assert the affirmative defense that the Post-expulsion Communications were true. *See* 42 Pa.C.S. § 8343(b)(1); Appellees' Brief at 1 (alleging that Eric was carrying "a weapon or, at minimum, an item intended to imitate a weapon"); *id.* at 2 n. 1 (suggesting that Eric's alleged weapon could be "fairly described [as] a Swiss Army-style penknife"); *see also id.* at 15 (arguing that truth is

claims); *id.* at 71a–72a (arguing that appellants failed to plead emotional distress with sufficient specificity). Although appellees did argue that their publication of the Expulsion Letter "was limited to that audience appropriate and necessary to hear it for purposes of school discipline," the decisions they cited were solely for propositions of secular defamation law. *See id.* at 68a–70a (citing *Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247 (1986); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980); *Maier v. Maretti,* 448 Pa.Super. 276, 671 A.2d 701 (1995); *Rybas v. Wapner,* 311 Pa.Super. 50, 457 A.2d 108 (1983)).

22. Again, we note that appellees do not develop such an argument with respect to appellants' non-abandoned negligent IED claim.

absolute defense to defamation claims and that, to determine truth of Post-expulsion Communications, trial court would have to examine School's disciplinary decision and, in turn, Catholic doctrine). Appellees' showing in this regard would be relevant only to the defamatory nature of the Communications, the first element of appellants' defamation claims, see 42 Pa.C.S. § 8343(a)(1). In contrast to this first element, appellees have not denied that: (2) they published the Communications (in fact, they admit that they distributed the Information Letter to St. Eleanor's parents, see Appellees' Brief at 3); [23] (3) the Communications applied to appellants and their son; (4) the recipients of the Communications understood their defamatory meaning; (5) the recipients of the Communications understood them as intended to be applied to appellants and their son; [24] (6) appellants and their son suffered substantial harm as a result of the Communications; or (7) appellees abused any potentially applicable conditional privilege. See 42 Pa.C.S. § 8343(a).

Instead, in arguing that their Post-expulsion Communications were rooted in religious authority, appellees rely on the fact that the Communications were motivated by appellees' adherence to religious authority. For purposes of preliminary objections, appellees' tactic is unavailing for two reasons. First, appellees' reasons for making the Communications are irrelevant to the only element of appellants' defamation claims that appellees have so far contested—namely, the defamatory nature of the Communications. Second, even if appellees contested the second element of the defamation claims—that they published the Communications—the inquiry concerning that element is not **why** appellees published the Communications but **whether** appellees published them. Thus, although appellees lift quotations from the School's Student/Parent Handbook in an attempt to cast the Information Letter in a

23. According to appellees, the Information Letter was sent to St. Eleanor's faculty as well.

24. Although appellees note that the Information Letter referred to an "unnamed" student, they did not deny appellants' allegation that "everyone who saw the letter knew that it referred to Eric" (Complaint ¶ 41).

more doctrinal light, the fact that, for instance, the School's teachers are to lead "by example"—or that the letter itself contains religious language—is relevant neither to the defamatory nature of the Communications nor to the allegation that appellees made them. Appellants are challenging the truth of the statement that Eric brought a weapon to school, not the truth of the statements that Eric failed to "convey respect to God, self, teachers, adults and other students," ignored "Christ's teachings and moral values," or failed to "love God and to respect [his] neighbor" (R.R. at 40a–41a, 34a–35a). Indeed, appellants do not even allege that Father Sweeney or Sister Marie ever stated that Eric violated these provisions of the School's Student/Parent Handbook.

In this regard, it is worth recalling the crucial distinction noted by the U.S. Supreme Court between two concepts embraced by the First Amendment: the freedom to believe and the freedom to act. While the first is "absolute," the High Court noted, "in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *see also Morris v. Morris,* 271 Pa.Super. 19, 412 A.2d 139, 142 (1979) (upholding against First Amendment challenge restriction in child custody order prohibiting father from taking daughter on door-to-door religious solicitations) ("[W]hile the adoption of a belief is absolutely protected, there exists only a qualified right to act on that belief.") (citing, *inter alia, Cantwell*).

Consistently with the High Court's admonition in *Cantwell,* many courts in our sister jurisdictions have declined to apply the deference rule after emphasizing the distinction between actions taken by a religious institution or leader and the reasons such actions were taken. *See, e.g., Lipscombe v. Crudup,* 888 A.2d 1171, 1174 (D.C.2005) (noting that fact that plaintiff's allegations of defendant's mismanagement of church funds "constitute the alleged **motivation** for the [defendant's] defamatory statement will not require the trial court to adjudicate the actual financial affairs of the church"); *Duncan v. Peterson,* 359 Ill.App.3d 1034, 296 Ill.Dec. 377, 835 N.E.2d 411,

422 (2005) ("Even if the reasoning behind defendants' decision to revoke the [plaintiff's] ordination ... is not reviewable because it is 'steeped in matters of theological import,' we may review defendants' conduct in carrying out the revocation [*i.e.*, whether defendants placed plaintiff in false light in letter they published to communicate revocation].") (noting also that "religious theory underlying whether [church] had the ability to revoke [plaintiff's] ordination ... is not the harm alleged in the complaint"); *Madsen v. Erwin*, 395 Mass. 715, 481 N.E.2d 1160, 1167 (1985) ("The First Amendment religion provisions contain two concepts, freedom to believe and freedom to act.... The torts of which Madsen complains are conduct and hence, they are subject to regulation.") (internal quotation marks omitted); *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766, 773 (Okla.1989) (declining to apply deference rule in admittedly "religiously-founded disciplinary matter" because dispute concerned "the allegedly tortious nature of religiously motivated acts and not with their orthodoxy *vis-à-vis* established church doctrine").[25]

In any event, while appellees explain—and plausibly so—that "[t]he communication of the expulsion provided example of the religious values of the [S]chool to parent and student alike" (Appellees' Brief at 16), appellees do not contend that such religious rationale for the Post-expulsion Communications required that the Communications specifically allege that Eric brought a "penknife" or "weapon" to school. Thus, this is not a case in which religious authority would be directly relevant to a party's showing on the merits of his or her

25. *See also Jones v. Trane*, 153 Misc.2d 822, 591 N.Y.S.2d 927, 931 (1992) (deeming deference rule inapplicable "inasmuch as it is conduct, and not creed, that underlies plaintiffs' actions"). *Compare with Murphy v. I.S.K.Con. of New England, Inc.*, 409 Mass. 842, 571 N.E.2d 340, 346–47 (1991) (applying deference rule in tort case where plaintiffs argued that emotional damages were caused by exposure to defendant's "religious beliefs" as opposed to "religiously motivated activity"); *Korean Presbyterian Church of Seattle Normalization Comm. v. Lee*, 75 Wash.App. 833, 880 P.2d 565, 569 (1994) (applying deference rule to plaintiff-church members' claim of outrage where claim was "**not** that the church leaders improperly **announced** [plaintiffs'] excommunications" but that leaders "wrongfully excommunicated [plaintiffs]") (first emphasis added).

opponent's claims. *Compare with Klagsbrun v. Va'ad Hara-bonim of Greater Monsey*, 53 F.Supp.2d 732, 741 (D.N.J.1999) (applying deference rule to plaintiffs-Orthodox Jews' defamation claims based on defendant-Orthodox rabbi association's statements that plaintiffs failed to obtain a valid Jewish divorce and "fail[ed] to submit to the jurisdiction of a rabbinical court"); *DeCorso v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 78 Conn.App. 865, 829 A.2d 38, 46 (2003) (noting that, in alleging negligent IED by defendant-Jehovah's Witnesses organization, plaintiff-ousted member "cites to Jehovah scripture and publications, which, according to the plaintiff, show what the defendants should have done"); *Murphy v. I.S.K.Con. of New England, Inc.*, 409 Mass. 842, 571 N.E.2d 340, 347 (1991) (holding that trial court infringed defendant-religious institution's free exercise rights by allowing plaintiff to introduce into evidence passages of defendant's sacred text to support plaintiff's claim of "intentional interference with parental rights"); *Schoenhals v. Mains*, 504 N.W.2d 233, 235 (Minn.Ct. App.1993) (noting that defendant-church and defendant-pastor assert that "the basis for the[ir allegedly defamatory] statements are in the Bible, and in the Church's religious beliefs and practices as expressed in the Church's written Articles of Faith and By-laws"); *Rasmussen v. Bennett*, 228 Mont. 106, 741 P.2d 755, 759 (1987) ("It is not within this Court's power to question the [defendant-religious institution]'s determination" that plaintiff-member "was not scripturally free to remarry[.]").

Regarding the Post-expulsion Communications themselves, as opposed to appellees' professed motivation for making them, appellees cite no relevant religious authority. Indeed, whether the item that Eric was expelled for bringing to school constitutes a weapon is a secular factual matter well within the ken of a fact-finding civil court. Section 1317.2 of the School Code requires the expulsion of "any student who is determined to have brought onto or is in possession of a weapon on any school property." 24 P.S. § 13–1317.2(a). The statute defines weapon as "includ[ing], but not be[ing] limited to, any knife, cutting instrument, cutting tool, nunchaku, firearm,

shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury." 24 P.S. § 13-1317.2(g). In at least one published decision, this definition has been interpreted and applied by a civil court. *See Picone v. Bangor Area Sch. Dist.*, 936 A.2d 556, 562 (Pa.Cmwlth.2007) (finding that pellet gun is "weapon" within meaning of Section 1317.2). Although the School Code is not applicable to St. Eleanor's, appellees do not cite any religious authority suggesting that there is a Roman Catholic definition of "weapon" that is distinct from that set forth at Section 1317.2(g). Certainly, neither this Court nor any other in Pennsylvania is any less learned than the Archdiocese as to such a secular question. *See Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 729, 20 L.Ed. 666 (1872) ("It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."). We are confident that the trial court can "rel[y] exclusively on objective, well-established concepts of [defamation] law familiar to lawyers and judges" to resolve appellants' defamation claims. *Jones v. Wolf*, 443 U.S. 595, 603, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

The extra-jurisdictional cases cited by appellees in which the deference rule was applied are not persuasive in this instance, as resolution of the disputes at issue in those cases would obviously intrude into the sacred precincts. *Compare, e.g., Schoenhals*, 504 N.W.2d at 234 (applying deference rule where plaintiff-expelled church members alleged defamation based on defendant-pastor's statement to congregation that, *inter alia*, plaintiffs exhibited "lack of financial stewardship with consistency and faithful tithing and offering" and "desire ... to consistently create division, animosity and strife in the fellowship"); *and In re Pleasant Glade Assembly of God*, 991 S.W.2d 85, 89 (Tex.App.1998) (applying deference rule where plaintiff-church members alleged negligence and negligent IED based on appropriateness of defendant-church employees' attempt to exorcise plaintiffs' daughter); *with Marshall v.*

*Munro*, 845 P.2d 424, 428 (Alaska 1993) (holding that neutral principles can be applied to adjudicate defamation claims alleging that defendant-pastor said that plaintiff-fellow pastor was divorced, was dishonest, was unable to preach due to throat surgery, and had made improper advances upon church member); *Lipscombe v. Crudup*, 888 A.2d 1171 (D.C.2005) (holding that trial court need not review allegations by plaintiff-church trustee that defendant-pastor mismanaged church funds in order to adjudicate plaintiff's secular allegation that defendant made defamatory statements about plaintiff to distract from misappropriation charge and to discredit plaintiff); *Duncan v. Peterson*, 359 Ill.App.3d 1034, 296 Ill.Dec. 377, 835 N.E.2d 411, 422 (2005) ("Even if the reasoning behind defendants' decision to revoke the [plaintiff's] ordination . . . is not reviewable because it is 'steeped in matters of theological import,' we may review defendants' conduct in carrying out the revocation."); *Olson v. First Church of Nazarene*, 661 N.W.2d 254, 263 (Minn.Ct.App.2003) (reversing trial court's application of deference rule because plaintiffs' tort claims "ar[o]se from context of pastoral counseling" where trial court failed to explain "how religious practice is burdened by an inquiry into whether sexual penetration occurred during ongoing, private counseling [even though] an inquiry into the content of such counseling is precluded" by First Amendment); *Menorah Chapels at Millburn v. Needle*, 386 N.J.Super. 100, 899 A.2d 316, 321 (App.Div.2006) ("[T]his case is in essence a contractual dispute between secular parties regarding the provision of services. Although the services at issue may be required under the tenets of the orthodox Jewish faith, the dispute does not concern the manner in which they were performed, but solely whether they were performed at all—a non-doctrinal matter."); *Bowie v. Murphy*, 271 Va. 127, 624 S.E.2d 74, 80 (2006) (determining that trial court can adjudicate plaintiff's defamation claims without "need [to] become involved with the underlying dispute among the congregation of the church" regarding petition to remove pastor).

Many of the decisions applying the deference rule that appellees cite concern the unique context of a religious institu-

tion's freedom to choose its clerical leader. This is a special class of cases that involves the employment relationship between a religious institution and its ministerial employees in which the courts understandably are particularly reluctant to encroach on the institution's decision-making process in selecting such employees. *Cooper v. Church of St. Benedict,* 954 A.2d 1216, 1219 (Pa.Super.2008). In fact, the U.S. Supreme Court in *Kedroff* specifically identified "[f]reedom to select the clergy" as having "federal constitutional protection as a part of the free exercise of religion against state interference." *Kedroff,* 344 U.S. at 116, 73 S.Ct. 143. As one decision cited by appellees explains:

> When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy[ ][ ] it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church. As the Court observed in *McClure v. Salvation Army,* 460 F.2d 553, 558–59 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972): "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern."

*Downs v. Roman Catholic Archbishop of Balt.,* 111 Md.App. 616, 683 A.2d 808, 812–13 (Ct.Spec.App.1996). As further evidence of the uniqueness of this class of cases, many courts—including our own Superior Court, *see Cooper, supra*—refer to application of the deference rule in this context as a "ministerial exception," citing *McClure, supra,* as one of the early cases using the term. *See, e.g., Bryce v. Episcopal Church in Diocese of Colo.,* 289 F.3d 648, 656 (10th Cir.2002) (citing *McClure* ); *Westbrook v. Penley,* 231 S.W.3d 389, 400–02 (Tex.2007) (quoting *McClure* ); *Patton v. Jones,* 212 S.W.3d

541, 548 (Tex.App.2006) (quoting *McClure* to explain reason for "this special rule for employment decisions about ministers").[26]

Thus, the concern in ministerial exception cases is not with chilling just any speech by religious institutions but, rather, that which is necessary to make an informed decision about the selection and retention of their own personnel. As one decision cited by appellees explains, "to allow as actionable church members' comments about their church leaders made at church meetings would inhibit the free and open discourse essential to a religious institution's selection of its minister. Such a result could chill expressions of dissatisfaction from church members and thereby intrude upon the autonomy of

**26.** *See also Higgins v. Maher*, 210 Cal.App.3d 1168, 258 Cal.Rptr. 757, 760 (1989) (quoting *McClure* in tort case arising from priest's dismissal); *Music v. United Methodist Church*, 864 S.W.2d 286, 289 (Ky.1993) (quoting *McClure* in defamation case based on dismissal of pastor); *Petruska v. Gannon Univ.*, 462 F.3d 294, 306–07 (3d Cir.2006) (cited by appellants) (quoting *McClure* and defining class of cases governed by ministerial exception as those that involve "any claim, the resolution of which would limit a religious institution's right to select who will perform particular spiritual functions").

In other decisions cited by appellees, courts, albeit using different words, convey a similar sense of the unique class of cases in which the "ministerial exception" applies. *See, e.g., Hutchison v. Thomas*, 789 F.2d 392, 394 (6th Cir.1986) ("This case involves the fundamental question of who will preach from the pulpit of the church, and who will occupy the church parsonage. The bare statement of the question should make obvious the lack of jurisdiction of a civil court.") (internal quotation marks omitted); *Yaggie v. Ind.-Ky. Synod Evangelical Lutheran Church in Am.*, 860 F.Supp. 1194, 1198 (W.D.Ky.1994) ("Not only is the interaction between a church and its pastor an integral part of church government, but all matters touching this relationship are of ecclesiastical concern. It makes no difference that the ecclesiastical dispute fails to touch on church or religious doctrine.") (citation omitted); *Farley v. Wisc. Evangelical Lutheran Synod*, 821 F.Supp. 1286, 1289 (D.Minn.1993) ("Personnel decisions by church-affiliated institutions affecting clergy are per se religious matters and cannot be reviewed by civil courts ....") (internal quotation marks omitted); *Heard v. Johnson*, 810 A.2d 871, 882 (D.C.2002) (noting that First Amendment prohibition on "judicial encroachment into church decisions ... includes church decisions concerning the employment of ministers because selection and termination of clergy is a core matter of ecclesiastical self-governance"); *id.* at 884 ("[W]hose voice speaks for the church is *per se* a religious matter.") (internal quotation marks omitted).

religious institutions to freely evaluate their choice and retention of religious leaders." *Seefried v. Hummel*, 148 P.3d 184, 191 (Colo.Ct.App.2005).[27]

It is in this class of ministerial exception cases that the Commonwealth Court decisions cited by appellees largely belong. Thus, it is of no moment for present purposes that the Commonwealth Court previously applied the deference rule in disputes involving, respectively, a religious fraternity's "ritual rules governing [its] position of Supreme Grand Master," *Poesnecker v. Ricchio*, 158 Pa.Cmwlth. 459, 631 A.2d 1097, 1103 (1993), or "a determination of whether [a certain minister] is in fact the local pastor and what, if any, powers the local pastor has with respect to appointment and removal of church officers." *Atterberry v. Smith*, 104 Pa.Cmwlth. 550, 522 A.2d 683, 686 (1987); *see also In re St. Clement's Church*, 687 A.2d 11 (Pa.Cmwlth.1996) (involving person's right to be admitted as member of church).

As for appellees' reliance on the extra-jurisdictional decisions that fall into the ministerial exception category, we find these decisions unpersuasive for purposes of the matter *sub judice* for the reasons explained above. *See, e.g., Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir.2002) (applying deference rule where plaintiff-fired lesbian youth minister alleged sexual harassment claim based on offensive statements made in letters to church leaders and at congregational meetings "discuss[ing] an internal church per-

---

**27.** *See also Yaggie*, 860 F.Supp. at 1199 ("Wisdom mandates that we refrain from dictating to a congregation that if they are unhappy with their religious leader they cannot freely speak their mind. In a mediation process between minister and congregation, all parties should be able to express their innermost feelings without fear of reprisal from the courts."); *Joiner v. Weeks*, 383 So.2d 101, 106 (La.Ct.App.1980) ("To allow defamation suits to be litigated to the fullest extent against members of a religious board who are merely discharging the duty which has been entrusted to them by their church could have a potentially chilling effect on the performance of those duties and could very well inhibit the free communication of important ideas and candid opinions."); *State ex rel. Gaydos v. Blaeuer*, 81 S.W.3d 186, 197–98 (Mo.Ct.App.2002) ("To allow a defamation suit to be litigated in connection with the termination of a church officer would tend to have a chilling effect on the management of the religious entity . . . .") (internal quotation marks omitted).

sonnel matter and the doctrinal reasons" for proposed termination); *Hutchison v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986) (applying deference rule to tort claims brought by plaintiff-pastor who was forced into early retirement based on "subjective judgments made by religious officials and bodies that [plaintiff] had become 'unappointable' due to recurring problems in his relationships with local congregations"); *Farley v. Wisc. Evangelical Lutheran Synod*, 821 F.Supp. 1286, 1290 (D.Minn.1993) (applying deference rule to plaintiff-fired pastor's defamation claim "challeng[ing] defendant-synod's authority ... to comment on [plaintiff]'s actions and abilities as a[ ] minister" because "[r]esolution of [plaintiff]'s claim would require the court to review [defendant]'s bases for terminating him"); *Higgins v. Maher*, 210 Cal.App.3d 1168, 258 Cal.Rptr. 757, 761 (1989) (applying deference rule in suit brought by fired priest where alleged torts "occurred as inseparable parts of a process of divestiture of priestly authority"); *Heard v. Johnson*, 810 A.2d 871, 885 (D.C.2002) (applying deference rule where plaintiff-fired pastor alleged defamation based on defendant-church members' manual, which was "essentially a record of the church congregation's ecclesiastical indictment of [plaintiff] and a declaration, pursuant to the religious doctrine of [the church] that [plaintiff] was not fit to continue as [the church]'s pastor"); *Music v. United Methodist Church*, 864 S.W.2d 286, 290 (Ky.1993) (applying deference rule to plaintiff-fired pastor's breach-of-contract suit, which "necessarily involves interpretation of the minister's occupational qualifications, and therefore forecloses any inquiry by civil courts"); *Downs v. Roman Catholic Archbishop of Balt.*, 111 Md.App. 616, 683 A.2d 808, 813 (Ct.Spec.App.1996) (applying deference rule because allegedly defamatory statements about plaintiff-expelled priesthood candidate were made by defendant-clerical supervisors with intent "to prevent him from becoming a priest ... thereby evidencing a determination on their part ... that [plaintiff] was not a suitable candidate for the priesthood"); *Black v. Snyder*, 471 N.W.2d 715, 720 (Minn.Ct.App. 1991) (applying deference rule to plaintiff-fired pastor's defamation claim where adjudication would require review of church's reasons for termination); *State ex rel. Gaydos v.*

*Blaeuer*, 81 S.W.3d 186, 197 (Mo.Ct.App.2002) (applying defer-
ence rule where plaintiff-fired principal alleged defamation
based on statements "relat[ing] to matters within the religious
cognizance of the diocese—the degree to which [plaintiff] was
able to separate herself from the opinions and influence of an
apparently unpopular, disenfranchised priest, and consequent-
ly the degree of influence of that priest in school affairs");
*Kyritsis v. Vieron*, 53 Tenn.App. 336, 382 S.W.2d 553 (1964)
(applying deference rule to plaintiff-defrocked priest's libel
claim where statement concerned defendant-priest's represen-
tation that plaintiff was, *inter alia*, unworthy of membership
in local clergy association); *Patton v. Jones*, 212 S.W.3d 541,
552 (Tex.App.2006) (applying deference rule where plaintiff-
fired church employee alleged defamation based on statements
made among pastors and staff parish relations committee
during their meeting regarding plaintiff's termination); *Cha v.
Korean Presbyterian Church of Wash.*, 262 Va. 604, 553
S.E.2d 511, 516 (2001) (applying deference rule to plaintiff-
fired pastor's defamation claims where statements were made
by "church officials who attended meetings of the church's
governing bodies that had been convened for the purpose of
discussing certain accusations against the plaintiff").[28]

Notably, in many of the ministerial exception cases involv-
ing defamation claims, the courts explicitly note that jurisdic-
tion cannot be exercised even though the allegedly defamatory
statements themselves may have been of a secular nature.
*See, e.g., Yaggie v. Ind.-Ky. Synod Evangelical Lutheran
Church in Am.*, 860 F.Supp. 1194, 1198 (W.D.Ky.1994) ("We
are also cognizant of the fact that, in this case, the alleged
defamatory statements do not express any religious principles
or beliefs. However, the fact remains that this action is the
result of a conflict confined within the Resurrection Lutheran
Church, concerning the employment relationship of its minis-
ter, and addressed in accordance with the church constitu-
tion."); *Seefried v. Hummel*, 148 P.3d 184, 190–91 (Colo.Ct.

---

28. *See also Miller v. Catholic Diocese of Great Falls, Billings*, 224 Mont.
113, 728 P.2d 794 (1986) (dismissing, on free exercise grounds, plain-
tiff-parochial school teacher's suit challenging discharge decision itself).

App.2005) ("It does not matter whether, as plaintiffs allege, the offending statements were secular in nature.... The statements giving rise to plaintiffs' defamation and other claims related directly to a church process that resulted in [one plaintiff's] termination as pastor.").[29] Such a *per se* presumption is inappropriate where, as here, both the ministerial exception and its fear-of-chilling-employment-review-speech rationale simply do not apply.

A few remaining decisions cited by appellees concern the religious practice of shunning former members who have been excommunicated from a church. In *Paul v. Watchtower Bible & Tract Society of New York, Inc.*, 819 F.2d 875 (9th Cir. 1987), a former Jehovah's witness brought suit raising various tort claims arising out of her former church's requirement that its members shun her. In holding that the First Amendment provided the church with a privilege defense to the suit, the U.S. Court of Appeals for the Ninth Circuit reasoned that "shunning is an actual practice of the Church itself, and the burden of tort damages is direct. Permitting prosecution of a cause of action in tort, while not criminalizing the conduct at issue, would make shunning an unlawful act." *Id.* at 881 (internal quotation marks omitted). In addition to *Paul,* appellees cite three state court decisions that, relying extensively on *Paul,* have applied the deference rule to tort suits arising out of a church's excommunication of one or more of its members. *See Hadnot v. Shaw,* 826 P.2d 978, 987–88 (Okla. 1992); *Westbrook v. Penley,* 231 S.W.3d 389, 400–04 (Tex. 2007); *see also Glass v. First United Pentecostal Church of DeRidder,* 676 So.2d 724, 728 (La.Ct.App.1996) (applying deference rule to tort suit brought by disfellowshipped church members where dispute was "rooted in an ecclesial tenet of [defendant-church] which prohibits members from suing fellow church members"); *id.* at 737 (quoting *Paul* extensively).

**29.** *See also Goodman v. Temple Shir Ami, Inc.,* 712 So.2d 775 (Fla.Dist. Ct.App.1998) (applying deference rule to plaintiff-fired rabbi's defamation claim where statements were made in context of temple meetings concerning plaintiff's continued employment even though statements made secular allegation that plaintiff once had physically assaulted a fellow rabbi).

*Paul* and its state court progeny are readily distinguishable on their facts from the instant case. As the Superior Court noted in addressing appellants' reliance on *Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105 (1975) below, appellants here "did not allege any facts showing that Appellees directed a 'shunning' of Appellants or that Appellees acted in a manner that excessively interfered with the maintenance of marriage and family relationships, alienation of affection, or the tortious interference with business relationships." *Connor*, 933 A.2d at 101 (emphasis omitted). Even if *Paul* were factually analogous here, its bright-line rule against recognizing causes of action for damages incurred from shunning is simply not the law of Pennsylvania. In *Bear*, this Court recognized that shunning **"may** be an excessive interference within areas of paramount state concern ... which the courts of this Commonwealth may have authority to regulate, even in light of the Establishment and Free Exercise clauses of the First Amendment." *Bear*, 341 A.2d at 107 (internal quotation marks omitted) (citing *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

In any event, we have already determined, after reviewing the elements of appellants' defamation claims and appellees' apparent truth defense, that it is reasonably likely that the trial court will ultimately be able to consider whether the parties carried their respective burdens as to each element of appellants' defamation claims without intruding into the "sacred precincts." At this stage of the proceedings, we conclude that neutral principles can be applied to determine whether the Post-expulsion Communications were defamatory. We therefore conclude that the Superior Court erred in determining that the trial court would be unable to resolve appellants' claims without "trespassing on sacred ground," *Gaston*, 712 A.2d at 761. As we emphasized above, our conclusion is based on the record and arguments as they currently exist at this early stage of the proceedings.

Simply put, it does not appear that this case will require "Caesar [to] enter[ ] the Temple [and] decide what the Temple believes," *Beaver–Butler*, 489 A.2d at 1320. Accordingly, the

decision of the Superior Court is reversed, and the matter is remanded for further pre-trial proceedings.[30] Upon remand, the trial court retains discretion to entertain a further distinct argument, consistently with the element-specific approach that we announce today, in support of appellees' position that the deference rule, as we have outlined it, precludes review of any or all of appellants' non-abandoned claims.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Justices SAYLOR, EAKIN and BAER and Justices TODD and GREENSPAN join the opinion.

---

**30.** In remanding the matter for further proceedings, we, of course, express no opinion as to the merits of any pre-trial challenge that appellees may still present to appellants' action, or of appellants' claims should they ultimately proceed to trial.