# Warnick v. All Saints Episcopal Church

*Timothy M. Kolman* and *W. Charles Sipio*, for appellant.

*Stewart J. Greenleaf, Jr.* and *Mary E. Kohart*, for appellees.

RAU, *J.*, April 15, 2014—

## I. STATEMENT OF THE CASE

This case involves the constitutional question of whether a civil court may interfere with how a church chooses its priest. Specifically, Father Jeremy M. Warnick (appellant) sued All Saints Episcopal Church, Charles E. Bennison (the Episcopal Bishop of Pennsylvania), and three All Saints congregants, challenging Bishop Bennison's decision to revoke his license to minister in Pennsylvania, Bishop Bennison's letter to the congregation explaining the decision and statements made by congregants about Father Warnick at a church meeting. The bishop's decisions stemmed from congregants' concerns about Father Warnick's conduct which, if true, constituted conduct unbecoming of clergy. At an earlier church meeting, congregants had complained that Father Warnick was living in the rectory with a woman not his wife and that he posted sexual material on facebook. Father Warnick was paid through the end of his contract even though his license was revoked before the contract was set to expire.

Father Warnick filed a canonical complaint, pursuant

to the procedures set forth by the Constitution and Canons of the Episcopal Church, appealing the bishop's decision and challenging the bishop's letter to the congregation explaining the decision. The diocese rejected his claims on all grounds. Father Warnick then filed this civil complaint, echoing the issues raised in his canonical complaint, challenging the bishop's revocation of his license and claiming that the bishop's and congregants' statements made related to that decision were defamatory and interfered with his ability to find work with other Episcopal parishes.

The defendants (appellees) in this case are All Saints Episcopal Church (All Saints), Bishop of Pennsylvania Charles E. Bennison, and All Saints congregants and Vestry members Diane Cairns, Richard Craig, and Linda Colwell. Father Warnick raised four claims against all defendants: defamation (Count I), tortious interference with existing and prospective contractual relations (Count II), libel/slander (Count III), and civil conspiracy (Count V). He also raised a breach of contract claim against defendant all saints (Count IV).

Defendants moved for summary judgment on all claims. This court granted the motion for three independently sufficient reasons: (1) the first amendment's deference and ministerial exception doctrines bar all claims; (2) Father Warnick's claims fail as a matter of law in areas where there is no factual dispute; and (3) Father Warnick failed to show *evidence* essential to prove his claims, resting instead on mere allegations. Father Warnick appeals this court's dismissal of his claims.

## II. UNDISPUTED FACTS

All saints is a congregation of the Protestant Episcopal Church. (*See* defs.' mot. summ. j. ex. A, am. compl. ¶¶ 2-4.) The Episcopal Church is a hierarchical church governed by

a constitution and canons that set forth specific requirements delineating the structure, administration, responsibilities, and procedures of its operations. (*See* defs.' mot. summ. j. ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church; defs.' mot. summ. j. ex. C, Constitution of the Episcopal Church.) As an ordained priest in the Episcopal Church Father Warnick consented to abide by the constitution and its canons including its structure of governance. (*See* defs.' mot. summ. j. Ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church, at all saints 131; defs.' mot. summ. j. ex. D, Warnick dep. 33:14-17, Aug. 22, 2013.) In addition, all priests agree to comply with the standards of conduct and are subject to discipline for a breach. (*See* defs.' mot. summ. j. ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church, at All Saints 163.) The standards of conduct require that a priest not engage in "conduct unbecoming a member of the clergy." (*See* defs.' mot. summ. j. ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church, at All Saints 132 & 135.) Father Warnick has acknowledged that when he became an Episcopal priest, he subjected himself to Church discipline. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 33:14-27, Aug. 22, 2013.) He admits that the Canons state that Episcopal clergy "have by their vows at ordination accepted additional responsibilities and accountabilities for doctrine, discipline, worship and obedience." (*See* defs.' mot. summ. j. & Pl.'s answer in opp'n to defs.' mot. summ. j. ¶ 8.)

At all relevant times, Charles E. Bennison was the bishop of the Episcopal Diocese of Pennsylvania. Under Canon law of the Episcopal Church, Bishop Bennison was the Ecclesiastical Authority for the Diocese of

Pennsylvania and had the authority to select which priests would be licensed to preach. (*See* defs.' mot. summ. j. ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church, at All Saints 75-76, 93, 98-99, 140; Defs.' mot. summ. j. ex. D, Warnick dep. 113:7-12; 113:24-114:1; 114:9-12; 114:18-21; 115:2-6, Aug. 22, 2013.) Without such a license, a priest "shall" not preach. (*See* defs.' mot. summ. j. ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church, Canon III.9.6(a), at All Saints 98.) The bishop must agree before a church enters into any employment contract with a priest. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 115:2-6, Aug. 22, 2013.) Moreover, Canon IV.7.3 provides for the ability of the bishop to restrict the ability of a priest to continue ministry:

> "Sec. 3. If at any time the Bishop determines that a member of the clergy may have committed any offense (as defined by canon), or that the good order, welfare or safety of the church or any person or community may be threatened by that member of the clergy, the bishop Diocesan may, without prior notice or hearing, (a) place restrictions upon the exercise of the ministry of such member of the clergy or (b) place such member of the clergy on administrative leave."

(*See* defs.' mot. summ. j. ex. B, excerpts of Constitution & Canons of the Episcopal General Convention of the Episcopal Church, Canon IV.7.3, at all saints 140.)

Father Warnick was from the diocese of Arizona but the Bishop of the Diocese of Pennsylvania licensed him to minister in Pennsylvania. (*See* defs.' mot. summ. j. ex. A, am. compl. ¶ 2.) Father Warnick had two one-year contracts with All Saints: January 2009 through January 2010 and January 2010 through January 2011. (*See* defs.'

mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶ 21.) Father Warnick understood that no permanency was attached to his position at All Saints. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 33:4-13, Aug. 22, 2013.)

Father Warnick has described himself as a "radical" priest. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 34:23-35:11, Aug. 22, 2013.) After arriving at All Saints, Father Warnick developed a plan to restructure the parish by allowing the existing, conservative congregation to receive part-time ministry while growing a new congregation interested in different, "contemporary" worship. It was his view that this was would address all saints' financial difficulties and increase parish membership. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 28 & 29.) Father Warnick also disagreed with some congregants on how the congregation's endowment fund should be used. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 39:2-12; 42:9-13, Aug. 22, 2013.) Some congregants complained that he was not accessible enough to parishioners and was not meeting his priestly obligations. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶ 33; defs.' mot. summ. j. ex. D, Warnick dep. 42:9-13, Aug. 22, 2013.)

In 2009 Father Warnick posted on his facebook answers to a "sexual position quiz" where he identified various sexual positions. His Facebook was available to some 300 people including some associated with the Episcopal Church including at least one all saints parishioner. Eventually he removed it from his profile because he knew it was "probably something that could have the potential to upset people." (*See* defs.' mot. summ. j. ex. D, Warnick dep. 92:13-99:5, Aug. 22, 2013.) Also during 2009, although he was married and separated, he and another woman, Sarah Caswell, began living at each other's houses (his house being the rectory) on several

alternate weekends. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 75:19-77:13, Aug. 22, 2013.) Kirk Stevan Smith, the Bishop of Arizona (Father Warnick's home diocese), advised him that such a living arrangement was not proper while he was still married to someone else, and that he should end any emotional relationship or physical contact with the woman not his wife until his divorce was final. (*See* defs.' mot. summ. j. ex. H, Bishop Smith's letter to Father Warnick, Jun. 19, 2009.)

Father Warnick's divorce was finalized in November 2009. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 211:12-18, Aug. 22, 2013.) After the divorce, he and Sarah Caswell married, at a Methodist rather than an Episcopal church. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 47 & 48.) Father Warnick admits that he did not follow the Episcopal Canons on remarriage after divorce. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 87:16-19, Aug. 22, 2013.)

On November 1, 2010, the Vestry voted at its meeting to recommend that All Saints maintain a part-time ministry. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶51.) Father Warnick claims that the vote to maintain a part-time ministry amounted to a vote to keep *him* on as a part-time priest, and that the vote gave rise to a valid employment agreement or contract between himself and All Saints, subject to Bishop Bennison's approval. (Am. compl. ¶¶20-21.) Father Warnick claims that on November 8, 2010, Ms. Cairns sent a letter and an email to Canon Jill Mathis, a representative of the diocese, stating that father Warnick was trying to overturn the Vestry vote choosing to have a part-time ministry. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 21.) Father Warnick claims that on November 22, 2010, Ms. Cairns emailed the bishop of Arizona with what he characterized as "numerous unfounded complaints." (*See*

*id.*)

On December 16, 2010, at a congregational meeting to discuss Father Warnick's ideas for restructuring the parish, the bishop, the Vestry, and the parish's congregants freely discussed their concerns, including father Warnick's performance, or purported nonperformance, of duties, along with his Facebook posting and his living with one woman while married to another. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 54 & 55; defs.' mot. summ. j. ex. D, Warnick dep. 130:6-15; 133:21-134:2, Aug. 22, 2013.)

Father Warnick claims that at that meeting Mr. Craig defamatorily said, "Jeremy posted inappropriate sexual material on Facebook. Sarah and Jeremy lived together in the rectory with Sarah's children before they were married and without the knowledge of Jeremy's ex-wife." (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 23.) Father Warnick admits that posting sexual information on Facebook and living with a woman before marriage would be "conduct unbecoming of a member of the clergy" (*See* defs.' mot. summ. j. ex. A, am. compl. ¶ 32), but he also admits that only an ecclesiastical court can make that determination about specific conduct. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 165:21-166:2, Aug. 22, 2013.)

After the meeting, Bishop Bennison, the Bishop of the Diocese of Pennsylvania, revoked Father Warnick's license to minister anywhere in Pennsylvania and drafted a letter explaining his decision: concerns raised at the meeting would, if true, be conduct unbecoming of clergy — but canonical structures prohibited his investigating the truth or falsity of the allegations, because only the authority in Arizona, where Father Warnick remained canonically resident, could do so. (*See* defs.' mot. summ.

j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 62 & 63; defs.' mot. summ. j. ex. J, Bishop Bennison's letter.)

Father Warnick asserts that a portion of the letter Bishop Bennison drafted is defamatory:

"At the parish-wide meeting on December 16, a number of you expressed gratitude and esteem for Father Warnick, his preaching and pastoral care. But at the same time two specific accusations were made which, if true, would constitute conduct unbecoming a member of the clergy.

I am not now in a position to ascertain the truth or falsehood of the accusations. That is the responsibility of Father Warnick's bishop, the Bishop of Arizona. Were Father Warnick canonically resident in the Diocese of Pennsylvania, I could temporarily inhibit his ministry until the Church could adjudge the veracity of the accusations. Because he is not canonically resident here, my only option is to revoke his license."

(Defs.' mot. summ. j. ex. J, Bishop Bennison's letter.) Bishop Bennison did not mail the letter to parishioners; it was sent to Bob Lambert, a parishioner, whom the Bishop expected to send it out to the congregation. (*See* defs.' mot. summ. j. ex. K, Caswell-Warnick dep. 31:6-8, Aug. 23, 2013.) Father Warnick and Ms. Caswell helped Mr. Lambert send the letter by stuffing the envelopes. (*See* defs.' mot. summ. j. ex. K, Caswell-Warnick dep. 31:9-32:1, Aug. 23, 2013.)

A few months later, on February 1, 2011, Ms. Cairns sent an email to Mr. Lambert, a supporter of Father Warnick, which read, in part, "If you were paying attention at the meeting with Bishop Bennison, you would have noted that 20 people stated their dissatisfaction and that the Warnicks did in fact live together before marriage!" (*See* defs.' mot.

summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 21.) The next day, February 2, 2011, Ms. Colwell emailed Mr. Lambert and referred to the allegation that Father Warnick and Sarah Caswell were "living together" but clarified that "I am not saying it is true or not true." (*See* defs.' mot. summ. j. ex. M, Colwell email to Lambert.) She also stated in that email that she had been told Ms. Caswell's children were enrolled in school in September 2009 and then rhetorically asked where the children lived between that time and December 2009. (*See id.*)

Father Warnick acknowledges that any renewal of his one-year contract could become effective only with the approval of the Bishop of the Diocese of Pennsylvania (*see* defs.' mot. summ. j. ex. A, am. compl. ¶ 15), but he claims interference with various existing and potential contracts. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 7.) Although his license was revoked twenty-five days before his contract expired, he was paid for the entirety of his contract and was allowed to stay on in the rectory, with water and electricity paid by All Saints, for six months after the revocation. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 70 & 71.)

Father Warnick filed a canonical complaint against Bishop Bennison accusing him of abusing his discretion by revoking his license and thereafter failing to provide Father Warnick with assistance and mediation in the face of the accusations made against him at the congregational meeting; that complaint was dismissed on August 4, 2011. (*See* defs.' mot. summ. j. ex. O, appeal of intake officer's initial dismissal in the matter of The Rev. Jeremy M. Warnick & The Rt. Rev. Charles E. Bennison, Jr. (Nov. 9, 2011)(original dismissal of complaint).) He appealed to the diocese; the appeal was rejected on December 26, 2011. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n

to defs.' mot. summ. j. ¶¶ 75 & 77.) The rejection of the appeal outlines the canonical rules that govern the complaint and appeals processes. (*See* defs.' mot. summ. j. ex. B, decision of the president of the disciplinary board for bishops.) It observes that, to a certain extent, "unbecoming conduct, like beauty, is 'in the eye of the beholder,'" and that Father Warnick's complaint and appeal accuse *Bishop Bennison* of conduct unbecoming of clergy. (*Id.*) The rejection also cites the canonical reasons for the dismissal of the complaint and the denial of the appeal. It says, "The canon directs the president to affirm or overrule a decision of dismissal by the intake officer within thirty (30) days (Title IV.6.6)." It further says, "[T]he complaint and the appeal fall under the provisions of Title IV.4.1(h)(8) which provides that 'in exercising his or her ministry a member of the clergy shall...refrain from: ... any conduct unbecoming a member of the clergy." It further quotes the canons:

> "Title IV.3 provides that, 'In order for any conduct or condition to be the subject of the provisions of this Title, the offense complained of must violate applicable provisions of Canon IV.3 or IV.4 *and must be material and substantial or of clear and weighty importance to the ministry of the Church*' (emphasis added)."

(*Id.*)

After Father Warnick's canonical complaint was unsuccessful, Father Warnick initiated this civil action on December 13, 2011, raising the same issues as the church already rejected. (*See* defs.' mot. summ. j. ex. O, appeal of intake officer's initial dismissal in the matter of The Rev. Jeremy M. Warnick & The Rt. Rev. Charles E. Bennison, Jr. (Nov.9, 2011) (original dismissal of complaint).)

### III. LEGAL ANALYSIS AND CONCLUSIONS

## A. The First Amendment bars all claims.

### 1. The Deference Rule and Ministerial Exception Apply in This Case.

The first words of the bill of rights say that "congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. As these words relate to this case, "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 702 (2012). Specifically, the "Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.* at 703. Accordingly, "it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* at 704. Meddling in a church's choice of priest would be "trespassing on sacred ground." *Gaston v. Diocese of Allentown*, 712 A.2d 757, 761 (Pa. Super. Ct. 1998). To do so would impermissibly allow "Caesar [to] enter[ ] the Temple to decide what the Temple believes." *Presbytery of Beaver-Butler of United Presbyterian Church in U.S. v. Middlesex Presbyterian Church*, 489 A.2d 1317, 1320 (Pa. 1985).

In this case, Father Warnick already appealed his termination to Episcopal authorities pursuant to the rules of the canonical process, and his appeal was denied. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 75 & 77). After not receiving the relief he sought from the episcopal church by whose authority and governance he agreed to be bound, Father Warnick now asks a secular civil court to override the ecclesiastical ruling.

The Supreme Court of Pennsylvania long ago described the importance of civil courts' deference to ecclesiastical courts in ecclesiastical matters:

> "The decisions of ecclesiastical courts, like those of every other judicial tribunal, are final; as they are the best judges of what constitutes an offence against the word of God, and the discipline of the church.
>
> ...
>
> Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

*German Reformed Church v. Com. ex rel. Seibert*, 3 Pa. 282, 282, 291 (1846).

And the Supreme Court of the United States held well over a century ago that

> "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

*Watson v. Jones*, 80 U.S. 679, 727 (1871).

This court's entertaining any of Warnick's claims would thus violate the "*deference rule*," which the Supreme Court of the United States created in light of the first amendment. The deference rule prohibits unjustifiable intrusion by civil courts into the religious affairs of organized religions:

"All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

*Watson*, 80 U.S. at 729.

The Pennsylvania Supreme Court has laid out how the deference rule applies:

"(1) examine the elements of each of the plaintiff's claims;

(2) identify any defenses forwarded by the defendant; and

(3) determine whether it is reasonably likely that, at trial, the fact-finder would ultimately be able to consider whether the parties carried their respective burdens as to every element of each of the plaintiff's claims without 'intruding into the sacred precincts.'"

*Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084, 1103 (Pa. 2009). The court in *Connor* stated that the deference rule provides for a "*ministerial exception*" in the "special class of cases that involves the employment relationship between a religious institution and its ministerial employees in which the courts understandably are particularly reluctant to encroach on the institution's decision-making process in selecting such employees."

*Id.* at 1108-09. "[F]ederal constitutional protection as part of the free exercise of religion against state interference" mandates that religious institutions have the right to select their own religious leaders. *Id.* at 1093 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

The Supreme Court of the United States recently reaffirmed the importance of the ministerial exception and the deference that must be afforded to organized religions in their choice of clergy, making reference to both the free exercise and the establishment clauses of the first amendment:

> "We agree that there is such a ministerial exception. The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."

*Hosanna-Tabor*, 132 S. Ct. at 706. The court emphasized that "the authority to select and control who will minister to the faithful — a matter strictly ecclesiastical — is the church's alone." *Id.* at 709 (internal citation and quotation omitted).

Father Warnick's tort and contract claims seek damages

for movants' frank debate about his suitability to minister to them and their resultant choice to discontinue his ministry at All Saints. The issues that triggered congregational conversations about revocation and the revocation of his license itself — his desire to change the worship style of the parish and the conflict this caused, congregants' concerns about perceived nonperformance of priestly duties — undergird all of Father Warnick's claims. It is hard to conceive of questions more appropriately left to the church itself than ecclesiastical matters related to a parish leader's potentially refocusing the parish away from the "traditional episcopal experience." (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 18.) It is questions such as these that it is not only most appropriate but also most *necessary* to apply the deference rule.

As the Supreme Court of Pennsylvania has observed, "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Connor*, 975 A.2d at 1109 (quoting *Downs v. Roman Catholic Archbishop of Balt.*, 683 A.2d 808, 812-13 (Md. Ct. Spec. App. 1996)). Indeed, "the concern in ministerial exception cases is not with chilling just any speech by religious institutions but, rather, that which is necessary to make an informed decision about the selection and retention of their own personnel." *Id.* at 1110. Bishop Bennison's decision to end Father Warnick's ministry and his restructuring plans, is exactly what the deference rule and ministerial exception are intended to shield from state intrusion.

2. The Deference Rule and Ministerial Exception Bar the Defamation Claims.

All of Father Warnick's defamation claims are rooted in movants' discussions of his ministry and their voicing of their displeasure. The defamation claim against Mr. Craig (a member of the Vestry) relates to concerns he expressed at the December 16, 2010, meeting about Father Warnick's living arrangement with the woman he later married, and his Facebook activity. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 23.) The defamation claims against Ms. Colwell and Ms. Cairns (also Vestry members) relate to their discussions about Father Warnick's ministry before and after Father Warnick's license was revoked. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 21; defs.' mot. summ. j. ex. M, Colwell email to Lambert.) The defamation claim against Bishop Bennison is based on the congregational letter that explained why he revoked Father Warnick's license. (Defs.' mot. summ. j. ex. J, Bishop Bennison's letter.)

If Father Warnick's claims were to move forward, this court would not only have to invade the church's process for choosing clergy, but also challenge the church's understanding of its own Constitutions and Canons. The Pennsylvania Supreme Court has held that considering defamation claims involving a religious order's clergy selection obviously violates the First Amendment's deference rule and ministerial exception:

> "When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy[] [] it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church. As

the court observed in *McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S. Ct. 132, 34 L.Ed.2d 153 (1972): 'The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.'"

*Connor*, 975 A.2d at 1109 (quoting *Downs v. Roman Catholic Archbishop of Balt.*, 683 A.2d 808, 812-13 (Md. Ct. Spec. App. 1996)). The Pennsylvania Supreme Court observed that congregational discussions in choosing clergy especially merit the shield provided by the deference rule:

"[T]o allow as actionable church members' comments about their church leaders made at church meetings would inhibit the free and open discourse essential to a religious institution's selection of its minister. Such a result could chill expressions of dissatisfaction from church members and thereby intrude upon the autonomy of religious institutions to freely evaluate their choice and retention of religious leaders."

*Id.* at 1110.

Father Warnick alleges that Mr. Craig's statement, and other movants' repetition thereof, is defamatory because such behavior, if true, would be conduct unbecoming—but Father Warnick admits that only an ecclesiastical court can make such a determination. "That [conduct unbecoming] is something that can *only* be determined through a trial process at this point in time *in the Episcopal Church. . . .* The *canons* are not clear. . . . They give general categories. . . . There's a *canonical process* that's required to make that determination." (*See* defs.' mot. summ. j. ex. D, Warnick dep. 165:21-166:2; 168:12; 168:15; 168:22-24, Aug. 22,

2013; emphasis added.) Thus, Father Warnick himself thus acknowledges that this court would have to encroach on the Episcopal Church's jurisdiction by interpreting Church Canons in order to assess the allegedly defamatory meaning of movants' statements.

Further, because Church Canons bear on whether Bishop Bennison had jurisdiction to investigate the truth or falsity of the accusations against Father Warnick, in attempting to assess movants' affirmative truth defense the court would again be improperly compelled to interpret canons and question church authorities' interpretations regarding ecclesiastical matters. This court would also need to interpret the canons in order to assess whether the affirmative defense of privilege applied to the statements at issue.

3. The Deference Rule and Ministerial Exception Bar the Contract Claims.

Similarly, the contract and interference with contract claims relating to All Saints' ending Father Warnick's full-time ministry and choosing not to give him part-time ministry are precluded from civil court analysis because of the deference rule and ministerial exception. Canonical and ecclesiastical discretion are at the core of church decisions over who can serve as a priest. Father Warnick acknowledges that an employment contract to be a priest could be entered into *only* with the bishop's approval. (*See* defs.' mot. summ. j. ex. A, am. compl. ¶ 15.) Church authorities' and congregants' communications about a priest's continued ministry within a church also implicate canonical discretion and would require interpreting the canons in order to assess whether such communications were privileged. Moreover, as discussed more fully in Section B, neither a party to a contract nor any party's agents can tortiously interfere with their *own* contracts.

But in order to assess this claim, this court would have to decide whether the bishop can be found liable for interfering with alleged contracts — that is, whether he was a third party to those contracts or whether he had to approve those contracts himself; this would again require the court to interpret the canons.

Any such interpretation by this court of church law would be an unconstitutional incursion by the state into sacred precincts: the deference rule and the ministerial exception prohibit it, and all of Father Warnick's claims are barred as a result.

4. Father Warnick Cites Nonbinding, Irrelevant Case Law in Support of His Argument that the Deference Rule and Ministerial Exception Do Not Apply.

Father Warnick argues that the decision of the Supreme Court of the United States in *Hosanna-Tabor* was limited to federal employment discrimination laws, and that after that decision came down some state courts outside Pennsylvania have allowed claims against churches to go forward notwithstanding. The Supreme Court's decision in *Hosanna-Tabor* did not limit the deference rule and ministerial exception to federal employment discrimination law, and the cases Father Warnick cite are, besides being nonbinding in this jurisdiction, factually inapposite. *Hosanna-Tabor* expressed no view on whether the ministerial exception applies to contract and tort claims because those issues were not before the court.

Pennsylvania courts have clearly held that the ministerial exception applies to contract and defamation claims. *See Connor*, 975 A.2d at 1109; *see also Mundie v. Christ Church of Christ*, 987 A.2d 794, 802 (Pa. Super. Ct. 2009); *Cooper v. Church of St. Benedict*, 954 A.2d 1216, 1219 (Pa. Super. Ct. 2008) (the ministerial exception applies "to decisions made by religious institutions

concerning employment of ministers"); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, 2005 WL 2455253, at *7 (E.D. Pa. Oct. 5, 2005) ("The ministerial exception is not limited in application only to certain federal or state employment claims. Rather, because the ministerial exception is based on the first amendment, it may apply to any federal or state cause of action that would otherwise impinge on the church's prerogative to choose its ministers.").

Father Warnick pointed to a Connecticut trial court case that concerned a church's failure to investigate, report, and supervise an employee priest who had been accused of sexual abuse of a child. *Doe No. 2 v. Norwich Roman Catholic Diocesan Corp.*, 2013 WL 3871430 at *1 (Conn. Super. Ct. Jul. 8, 2013) (unpublished). He cited that case for its observation, "The first amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters." *Id.* at *4 (quoting *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999)). In *Doe*, claims of failure to warn and negligent supervision of an allegedly abusive priest were allowed to go forward. *Id.* at *3. The *Doe* claims regarding a priest's alleged sexual abuse of a child had nothing to do, as this case manifestly does, with selection of a minister or inquiry into church doctrine.

Father Warnick also cited a South Carolina Supreme Court case for the idea that a pastor's defamation claim could go forward against a church. *Banks v. St. Matthew Baptist Church*, 2013 S.C. LEXIS 249 at *9-*10 (S.C. Sept. 25, 2013). *Banks* did not involve the selection of a minister or anything pertaining to church doctrine; it had to do with a pastor accusing church trustees of engaging in financial impropriety. Indeed, the court stated that if

the pastor had stated they had "violated church law," the deference rule would in fact bar the defamation claim. *Id.* at *9.

These cases are not only nonbinding on this court; they are factually distinguishable and have no bearing whatsoever on this case. A civil court's consideration of Father Warnick's claims, which concern a church's selection of its minister, would be "excessive entanglement into church matters" barred by the First Amendment. *Mundie v. Christ Church of Christ*, 987 A.2d 794, 802 (Pa. Super. Ct. 2009). Such consideration of any of his claims would intrude on sacred precincts. The deference rule and ministerial exception apply here, barring all of Father Warnick's claims.

B. Even if the First Amendment did not bar all claims, Father Warnick's claims fail as a matter of law.

A party may move for summary judgment "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa.R.C.P. 1035.2(1). It is this court's duty to determine whether, viewing the evidence in the light most favorable to Father Warnick, his allegations would constitute violations as a matter of law. Father Warnick's claims fail as a matter of law because the undisputed evidence shows that necessary elements have not been shown for defamation, contract and civil conspiracy claims.

1. Defamation/Libel/Slander

The allegedly defamatory statements in this case do not constitute defamation because they are either true, incapable of defamatory meaning or opinion. A person

bringing a defamation claim[1] in Pennsylvania bears the burden of proving:

"(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion."

*Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 903 (Pa. 2007) (citing 42 Pa. cons. stat. ann. § 8343(a)). Whether a statement is capable of defamatory meaning is a question of law that the court must determine "in the first instance." *Bell v. Mayview State Hosp.*, 853 A.2d 1058, 1061-62 (Pa. Super. Ct. 2004). "If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Livingston v. Murray*, 612 A.2d 443, 446 (Pa. Super. Ct. 1992). An action in defamation "is based on a violation of the fundamental right of an individual to enjoy a reputation unimpaired by false and defamatory attacks." *Berg v. Consol. Freightways, Inc.*, 421 A.2d 831, 833 (Pa. Super. Ct. 1980). The law states that there is no defamation if the statements are true. *Phila. Newspapers,*

---

1. Father Warnick lists "Libel/Slander" (Count III) as a separate claim from "Defamation" (Count I), but libel and slander are simply forms of defamation. *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008).

*Inc. v. Hepps*, 475 U.S. 767, 775 (1985); *Spain v. Vicente*, 461 A.2d 833, 836 (Pa. Super. Ct. 1983). The offending statements must also have caused damage in order to sustain a claim: "It is not enough that the victim of the 'slings and arrows of outrageous fortune', be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society." *Scott-Taylor, Inc. v. Stokes*, 229 A.2d 733, 734 (Pa. 1967).

And as for whether a statement can be construed as defamatory by innuendo:

"It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed by the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff, and do not sustain the innuendo, the case should not be sent to a jury."

*Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944).

Bishop Bennison's letter is not capable of defamatory meaning and is, at most, non-actionable opinion. Father Warnick objects to these, the second and third paragraphs of the letter:

"At the parish-wide meeting on December 16, a number of you expressed gratitude and esteem for Father Warnick, his preaching and pastoral care. But at the same time two specific accusations were made which, if true, would constitute conduct unbecoming a member of the clergy.

I am not now in a position to ascertain the truth or falsehood of the accusations. That is the responsibility

of Father Warnick's bishop, the Bishop of Arizona. Were Father Warnick canonically resident in the diocese of Pennsylvania, I could temporarily inhibit his ministry until the church could adjudge the veracity of the accusations. Because he is not canonically resident here, my only option is to revoke his license."

(Defs.' mot. summ. j. ex. J, Bishop Bennison's letter.)

Even if the charges the bishop refers to but does not name were defamatory, simply observing that the accusations were made is not defamatory, especially because Father Warnick himself has alleged and acknowledges that the statements were actually made and would, if true, indeed constitute conduct unbecoming. (*See* defs.' mot. summ. j. ex. A, am. compl. ¶¶ 31 & 32.) The letter does not reiterate or quote the allegedly defamatory statements, and it stresses that the bishop is not in a position to determine their alleged truth. (Defs.' mot. summ. j. ex. J, Bishop Bennison's letter.) There is nothing defamatory about the bishop's stating that episcopal procedures prohibited him from investigating the accusations' truth: his non-actionable opinion that he had no such authority stemmed from his interpretation of episcopal canons.

Moreover, the bishop's letter cannot be construed as defamatory by innuendo, either — not without distorting its actual words: Father Warnick argued that the revocation of his license in the aftermath of the accusations referred to in the letter suggests that they were true, but that conclusion fails to account for context. The letter plainly states the license was revoked in accordance with ecclesiastical rules ("he is not canonically resident here"), and revocation was the only choice because the bishop lacked jurisdiction to assess the truth or falsity of the accusations. (Defs.' mot. summ. j. ex. J, Bishop Bennison's letter.) The context does not at all suggest that the bishop believed the accusations

were true.

Furthermore, Father Warnick and Ms. Caswell helped an All Saints parishioner publish the letter. They understood that it was the bishop's order that the letter be sent to the congregation, and they helped stuff the letter into envelopes to be sent to parishioners. (*See* defs.' mot. summ. j. ex. K, Caswell-Warnick dep. 31:6-32:1, Aug. 23, 2013.) Father Warnick seeks to hold the bishop liable for publishing a defamatory statement that Father Warnick helped to publish.

Crucially, Father Warnick admits that Mr. Craig's statement at the congregational meeting was *true*: he did take a Facebook sexual-position quiz, and he did live with Ms. Caswell before they were married and while he was still married to someone else. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 75:19-77:13; 92:13-99:5, Aug. 22, 2013.) Referring to her staying at the rectory, he said, "Just to clarify, when I say times, I mean weekends. I mean, it was a time frame only over a weekend that she would have stayed." (*See* defs.' mot. summ. j. Ex. D, Warnick dep. 76:15-18, Aug. 22, 2013.) Referring to his staying with Ms. Caswell, he said, "I stayed in her home." (*See* defs.' mot. summ. j. ex. D, Warnick dep. 78:16, Aug. 22, 2013.) He acknowledged that these stays occurred "between early summer 2009 to December 21, 2009." (*See* defs.' mot. summ. j. ex. D, Warnick dep. 75:20-21, Aug. 22, 2013.) As for the sexual-position quiz, he said, "It was a quiz. It was something that I did for fun." (*See* defs.' mot. summ. j. ex. D, Warnick dep. 99:21-23, Aug. 22, 2013.) Because he thus concedes the truth, the defamation claim fails as a matter of law. Mr. Craig said: "Jeremy posted inappropriate sexual material on Facebook. Sarah and Jeremy lived together in the rectory with Sarah's children before they were married and without the knowledge of Jeremy's ex-wife." (*See* defs.' mot. summ. j. ex. G, pl.'s

resp. to defs.' first set of interrogs., no. 23.)

Father Warnick seeks to avoid the effect of his admission by torturing the plain meaning of the phrase "lived together." Father Warnick's regular stays at Ms. Caswell's home, and Ms. Caswell's regular stays at the rectory, clearly amount to "living together." Father Warnick seeks somehow to parse the phrases "stay with" and "live together," but they are the same thing. Where one lives is the place one resides, and "[r]esidence...is 'a factual place of abode' evidenced by a person's physical presence in a particular place." *Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 965 (Pa. Super. Ct. 2007). The presence need not be permanent; it may be marked merely by "habitual repetition." *Id.* If one resides, or lives, at the same place as another — if one shares one's physical presence with another in a particular place — one is "living together" with that other person. The unavoidable common-sense judgment of this court is that Father Warnick's and Ms. Caswell's admissions that they stayed at one another's homes on multiple occasions over a considerable period of time lead to the conclusion that on the occasions that they stayed at each other's homes, they were "living together."

Father Warnick argues that the use of the phrase "living together" or "lived together" or "live together" implies, by way of "innuendo," that he was carrying on "sexual relations" with Ms. Caswell at the time. (*See* pl.'s answer in opp'n to defs.' mot. summ. j. ¶ 44.) This court found that this is not a fair or reasonable construction. *See Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944) (holding that where the words do not sustain the purported innuendo, the case should not go to a jury).

As for the statements attributed to Ms. Cairns and Ms. Colwell, they are either not capable of defamatory meaning, non-actionable opinion, or true. As for Ms.

Colwell, Father Warnick attributes defamatory meaning to an email she sent to one of his supporters. (*See* defs.' mot. summ. j. ex. M, Colwell email to Lambert.) The email generally referenced "living together," reiterating the statement made at the meeting, and stating, "I am not saying it is true or not true." (*See id.*) She wrote she had been told that his future wife's children were enrolled in school and rhetorically asked where the children had lived at the time of enrollment. (*See id.*) She did not say where she was told they were enrolled, and even if she had said they were enrolled in Philadelphia, that statement would not affect Father Warnick's reputation. The rest of her email contains her non-actionable opinion about Father Warnick's suitability for ministering to the parish.

Father Warnick also attributes three allegedly defamatory emails to Ms. Cairns. One email is only alleged to exist, but Father Warnick does not produce it; another email states Father Warnick was trying to overturn the Vestry vote deciding on a part-time ministry. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 21.) There is nothing defamatory about that. Another email, to one of Father Warnick's supporters, said, "If you were paying attention at the meeting with Bishop Bennison, you would have noted that 20 people stated their dissatisfaction and that the Warnicks did in fact live together before marriage!" (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 21.) Father Warnick acknowledges that some parishioners expressed unhappiness with him at the meeting, and that Sarah Caswell and her children lived with him on some weekends in 2009 before he and Ms. Caswell were married. (*See* defs.' mot. summ. j. ex. D, Warnick dep. 75:19-77:13; 130:6-15, Aug. 22, 2013.)

Because Father Warnick concedes the truth by acknowledging that he took the facebook quiz and

lived with Sarah Caswell before they were married-and because none of the statements he points to are capable of defamatory meaning or are opinion — he failed to meet the elements of his defamation claims and this court was compelled to grant summary judgment on these claims in defendants' favor.

### 2. Contract Claims

The elements for a claim of breach of contract are "1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003). An enforceable contract is entered into when the following elements are met: "'offer', 'acceptance', 'consideration' or 'mutual meeting of the minds.'" *Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. Super. Ct. 1993).

Father Warnick admits he was paid his entire salary, and allowed to live in the rectory, through the contract's expiration. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 70 & 71.) Even if his dismissal, pursuant to the revocation of his license, had been a breach of the January 2010 contract, Father Warnick suffered no *damages*, a necessary element of the claim.

Although Father Warnick hoped to have a part-time contract in 2011, no such contract was ever even formed. As Father Warnick himself acknowledges, there could be no such contract without the bishop's consent: Father Warnick admits that any contract renewal could become effective only with the bishop's approval. (*See* defs.' mot. summ. j. ex. A, am. compl. ¶ 15.) The bishop never consented; instead he revoked Father Warnick's license, so there could be no contract. (Defs.' mot. summ. j. ex. J, Bishop Bennison's letter.) He could not get a part-time employment contract to be a priest after having his license

to minister revoked. Moreover, Father Warnick did not produce any evidence there was a "meeting of the minds," *Schreiber*, 627 A.2d at 808, on any aspect of the purported part-time contract, and certainly none of the essential terms — compensation, hours, scope of responsibilities, or benefits.

The elements of a cause of action for intentional interference with existing or prospective contractual relations are as follows:

"(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct."

*Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997).

Father Warnick alleges one or more of movants tortiously interfered with two existing and four potential future contracts. No action was taken to harm the contractual relationship with respect to the January 2010 contract, and Father Warnick suffered no damages: All saints paid him in full under that contract and allowed him to live in the rectory for an additional six months after it was over. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 70 & 71.)

As for the alleged part-time employment contract

for the next year, Father Warnick alleges only that Ms. Colwell moved the Vestry to delay consideration of a part-time contract until after the December 16 congregational meeting. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 7.) An entity cannot interfere with its own contract. *Maier v. Maretti*, 671 A.2d 701, 707 (Pa. Super. Ct. 1995). A contracting entity's agents are not "third parties," and their conduct cannot give rise to a claim of tortious interference. *Daniel Adams Assoc. v. Rimbach Pub.*, 519 A.2d 997, 1001-02 (Pa. Super. Ct. 1987). As a part of the Vestry, Ms. Colwell could not possibly interfere with the Vestry's own potential contracts.

Father Warnick also asserts the Bishop of Pennsylvania, Bishop Bennison, tortiously interfered with four of his potential employment contracts with episcopal parishes in southeastern Pennsylvania. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 7.) The Bishop of Pennsylvania's approval is necessary for any employment contract between any episcopal parish in Pennsylvania and a priest. Since the bishop is an agent of the church, as a matter of law he cannot be found to have interfered with the church's own contracts.

Because Father Warnick suffered no damages with respect to his final existing contract to be All Saints' priest, because he could not show any evidence that the purported part-time contract ever came into being, and because as a matter of law a party cannot tortiously interfere with its own contracts, Father Warnick failed to show the elements of his contract claims and this court was compelled to grant summary judgment on these claims in defendants' favor.

3. Civil Conspiracy

Civil conspiracy requires that "two or more persons combine or enter an agreement to commit an unlawful

act or to do an otherwise lawful act by unlawful means. Proof of malice is an essential part of a cause of action for conspiracy." *Burnside v. Abbott Labs.*, 505 A.2d 973, 980 (Pa. Super. Ct. 1985) (internal citations and quotations omitted). Without a cause of action for any particular act, a cause of action for civil conspiracy to commit that act is not possible. *DeBlasio v. Pignoli*, 918 A.2d 822, 831 (Pa. Commw. Ct. 2007). Because, as already explained, Father Warnick failed to show the elements of his defamation or contract claims, he necessarily failed to show the elements of his claim for civil conspiracy as it relates to those claims. Because movants were entitled to judgment as a matter of law on all other claims, they were also entitled to judgment as a matter of law on this one.

C. Movants were entitled to summary judgment because Father Warnick failed to provide evidence in support of his claims.

A party may also move for summary judgment if "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action." Pa.R.C.P. 1035.2(2). In answering a motion for summary judgment in this situation, a party must identify "*evidence* in the record establishing the facts essential to the cause of action...which the motion cites as not having been produced." Pa.R.C.P. 1035.3(a)(2) (emphasis added). The non-movant — Father Warnick in this case — must provide sufficient evidence on issues essential to his case on which he bears the burden of proof such that a jury could return a verdict in his favor. *Hoffman v. Pellak*, 764 A.2d 64, 65-66 (Pa. Super. Ct. 2000). Allegations are insufficient at this stage; actual evidence must be produced. *ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1213 (Pa. Super. Ct. 2011) (quoting *Shepard v. Temple Univ.*, 948 A.2d 852, 856 (Pa. Super. Ct. 2008) (citations omitted)). "Failure of a non-moving party to

adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof...establishes the entitlement of the moving party to judgment as a matter of law." *Keystone Freight Corp. v. Stricker*, 31 A.3d 967, 971 (Pa. Super. Ct. 2011) (quoting *Young v. PennDOT*, 744 A.2d 1276, 1277 (Pa. 2000)). The "mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Phaff v. Gerner*, 303 A.2d 826, 829 (Pa. 1973).

As already explained, Father Warnick makes various *allegations*, but he fails to do what the law requires him to do in order to survive a motion for summary judgment: he fails to offer *evidence* on some of the required elements of his claims. He *alleges* that statements are false but fails to produce evidence that they are false, and in many instances, as previously described, he admits their truth. For example, he claims that it is false that he and Sarah Caswell lived together before they were married (*see* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶¶ 70 & 71) but concedes they spent the night or weekends at one another's homes while he was still married to someone else.[2] He also admits to the Facebook sexual position quiz. (*See* defs.' mot. summ. j. ex. A, am. compl. ¶ 32). Consequently, others' statements about his facebook page, while perhaps embarrassing, are not false and cannot constitute defamation. Father Warnick concedes that posting sexual information on facebook and living with a woman before marriage might be construed by an ecclesiastical court as "conduct unbecoming of a member of the clergy." (*See* defs.' mot. summ. j. ex. D, Warnick dep. 165:21-166:2, Aug. 22, 2013.) Consequently, statements made by others to that same effect are not false

2. Father Warnick just quibbles with the plain meaning of the phrase "living together."

and not defamation under the law.

Father Warnick *alleges* that certain written communications exist, but he provides no evidence for them. (*See* defs.' mot. summ. j. ex. G, pl.'s resp. to defs.' first set of interrogs., no. 21.) He *alleges* that a vote in 2011 constituted a new and binding contract, but he provides no *evidence* in support of this allegation. (*See* defs.' mot. summ. j. & pl.'s answer in opp'n to defs.' mot. summ. j. ¶ 51.) He *alleges* a besmirched reputation, but offers no *evidence* for it. (*See, e.g.,* pl.'s br. in opp'n to defs.' mot. summ. j. at 14.) He *alleges* economic losses, but offers no *evidence* of them. (*See, e.g.,* defs.' mot. summ. j. ex. A am. compl. ¶¶ 67, 69, 71, 81, 90, 99, 101, 109, & 113.)

Father Warnick's mere *allegations* are not enough to allow his claims to proceed to a jury. At this stage, father Warnick must produce evidence of falsity, the existence of contracts, and damages among other required elements of his claims. He failed to do so. Consequently, having failed to produce necessary evidence, Father Warnick's claims are insufficient to survive a motion for summary judgment.

## IV. CONCLUSION

Even if the bill of rights did not contain an establishment clause and a free exercise clause protecting religious freedom, defendants would be entitled to summary judgment, because Father Warnick failed to make out the elements of his claims or offer sufficient evidence under the law for any of his claims to proceed to trial. More fundamentally, Father Warnick's claims are barred because the first amendment guarantees the free exercise of religion and provides for the separation of church and state. Father Warnick asks this court to interfere with a church's choice of minister, which is one of the deepest and most elemental forms of religious expression

there is, and which is exactly the kind of religious choice the first amendment was expressly designed to protect. Such state invasion of religious matters is emphatically forbidden by the constitution. As the chief justice of the United States expressed it, "The church must be free to choose those who will guide it on its way." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 710 (2012).